## In re CITY OF CENTRAL FALLS, RHODE ISLAND, Debtor.

### City of Central Falls, Rhode Island, Plaintiff

v.

### Central Falls Teachers' Union, Rhode Island Council 94, AFSCME, AFL–CIO Local 1627, et al., Defendants.

**Bankruptcy No. 11–13105–FJB.
Adversary No. 11–1094.**

United States Bankruptcy Court,
D. Rhode Island.

March 23, 2012.

Christine M. Curley, Christine M. Curley, Esq., North Kingstown, RI, Theodore Orson, Orson and Brusini Ltd., Providence, RI, for Plaintiff.

Curtis C. Mechling, Stroock & Stroock & Lavan LLP, Hanan B. Kolko, Meyer, Suozzi, English & Klein, P.C., New York, NY, Marc B. Gursky, Gursky Law Associ-

ates, North Kingstown, RI, William J. Delaney, Delaney DeMerchant & Heitke LLC, Forrest L. Avila, RI Department of Education, Michael R. McElroy, Schacht & McElroy, Claire J.V. Richards, State of Rhode Island, Providence, RI, Girard A. Galvin, Corcoran, Peckham, Hayes & Galvin, P.C., Newport, RI, for Defendant.

## MEMORANDUM OF DECISION ON CITY'S MOTION FOR SUMMARY JUDGMENT AND ON TEACHERS' UNION'S MOTION TO DISMISS OR ABSTAIN

FRANK J. BAILEY, Bankruptcy Judge.

This adversary proceeding arises in the bankruptcy case of the City of Central Falls, Rhode Island (the "City"), a proceeding for adjustment of debts of a municipality under chapter 9 of the Bankruptcy Code. The plaintiff is Robert G. Flanders, Jr. (the "Receiver") in his capacity as the state-appointed receiver of the City. The principal defendants are two labor unions, the Central Falls Teachers Union, Local 1657 of the American Federation of Teachers (the "Teachers' Union") and Local 1627, Rhode Island Council 94, AFSCME, AFL–CIO ("Council 94") (jointly, the "Unions"). Each is party to a collective bargaining agreement with the Central Falls School District (the "School District"), which—suffice it to say for now—runs the public schools in Central Falls. As part of his efforts to fashion a feasible and comprehensive plan of debt adjustment in this bankruptcy case, the Receiver has been renegotiating the CBAs with the Unions, but his efforts have been impeded by uncertainty over two issues: (i) whether the School District is part of the City, such that the debts and contract obligations of the School District are obligations of the City and therefore subject to adjustment in this bankruptcy case; and (ii) whether the Receiver, acting on behalf of the City, has the power under Rhode Island's Fiscal Stability Act, the statute defining his powers as receiver, to collectively bargain with the Unions. By his complaint in this adversary proceeding, the Receiver seeks a declaratory judgment resolving both issues in the affirmative, and he has now moved for summary judgment to that effect. In response, the Teachers' Union has moved to dismiss for lack of subject matter jurisdiction or to abstain; and, on the merits, both Unions have opposed summary judgment and urged resolution of the Receiver's issues in the negative. In view of the need to avoid significant delays in the reorganization process, the Court heard both motions on an expedited basis and now addresses them in this memorandum of decision.

### PROCEDURAL HISTORY

On August 1, 2011, the City, by and through the Receiver, filed a voluntary petition under Chapter 9 of the Bankruptcy Code, commencing the Chapter 9 case in which this adversary proceeding arises. On December 1, 2011, the Court entered an Order for Relief in the Chapter 9 case. In the first five months of the case, the Receiver negotiated agreements with three unions with whom the City had collective bargaining agreements and a further agreement with the City's retirees.[1] The court approved these agreements, each a major step toward a confirmable plan of debt adjustment.

---

1. The Receiver has previously reported to the Court that he has successfully negotiated new collective bargaining agreements with the City's police, firefighter, and municipal worker unions; in each instance the new agreement was part of a consensual resolution of a motion by the Receiver to reject earlier collective bargaining agreements with these unions.

In the meantime, the Receiver had also begun negotiations with the defendant Unions, the Teachers' Union and Council 94. Each is a party to a collective bargaining agreement with the Central Falls School District. The Teachers' Union's contract expired on August 31, 2011, but under state law, its terms continue to govern for a time, the extent of which is uncertain.[2] Council 94's contract expires on June 30, 2013. Though negotiations have continued, each defendant Union expressly has reserved the right to argue (i) that the School District is not part of the City and therefore the collective bargaining process is not within the Bankruptcy Court's subject-matter jurisdiction and (ii) that the Receiver does not have the power to act on behalf of the City relative to collective bargaining with the defendant Unions.

On December 30, 2011, the Receiver filed the complaint commencing this adversary proceeding, a complaint seeking only declaratory relief and naming only the Teachers' Union as a defendant. It requested two declarations: in Count One, "that the School District is part of the City and therefore, *ipso facto*, the collective bargaining process is within the Bankruptcy Court's subject-matter jurisdiction"; and in Count Two, "that the Receiver has the power under the Fiscal Stability Act to act on behalf of the City relative to collective bargaining with the Union." By a first amendment to the complaint, the Receiver added Council 94 as a defendant. By a second amendment, the Receiver added numerous related governmental parties (the "Governmental Defendants") as nominal defendants, the court having determined that these were necessary parties.[3] These amendments notwithstanding, the complaint's demand for declaratory relief is unchanged. At the Receiver's request, the court established an expedited schedule for adjudication of the adversary proceeding.

Before the time to answer the Second Amended Complaint, the Receiver filed the present motion for summary judgment. The Teachers' Union filed an opposition to the motion for summary judgment and a "cross-motion" to dismiss for lack of subject matter jurisdiction or to abstain.[4] Having moved under Fed.R.Civ.P. 12(b)(1) to dismiss or abstain, the Teachers' Union has not yet filed an answer, and its answer has not come due. In a separate opposition to the motion for summary judgment, Council 94 indicated that it was relying on the opposition filed by the Teachers' Union and has submitted no separate argument of its own. Council 94 has filed an answer opposing the Receiver's demands for de-

---

**2.** At the hearing, counsel for the Teachers' Union indicated that Rhode Island law was unclear, that the contract's terms will govern until a new agreement is reached or perhaps until impasse resolution procedures are at an end. I express no opinion on the issue. The parties agree that the contract's terms continued to govern as of the date of the hearing.

**3.** The Governmental Defendants are the State of Rhode Island; the Rhode Island Department of Elementary and Secondary Education and Debora Gist as the Department's Commissioner; the Rhode Island Board of Regents for Elementary and Secondary Education and George Carullo, Patrick A. Guida, Colleen Callahan, Lorne A. Adrian, Carolina B. Bernal, Dr. Robert Carothers, Karin Forbes, Matthew Santos, and Betsy Shimberg as members of the Board; the Central Falls School District; Frances Gallo, as Superintendent of the Central Falls Schools; and the Central Falls Board of Trustees and Anna Cano Morales, Sonia Rodrigues, Stephanie Gonzalez, Cheryl LaFond, Brian Keith Nordin, and Ana Cecilia Rosado as members of the Board of Trustees.

**4.** Though the Teachers' Union has argued that it would be appropriate, on the Receiver's motion for summary judgment, to enter judgment *against* the Receiver, it has not filed a cross-motion for summary judgment.

claratory relief.[5] Each of the Governmental Defendants has answered the Second Amended Complaint and, without articulating a position on the two main issues, has simply requested the judgment of the court; none has opposed the motion for summary judgment.

By order of August 5, 2011 in the Chapter 9 case, the court established October 4, 2011 as the deadline for filing proofs of claim, but the order also provided that "a claim arising from the rejection of an executory contract ... of the debtor may be filed within such time as the court later directs." The Teachers' Union has not filed a proof of claim. On October 3, 2011, Council 94 filed a proof of claim in an amount stated as "unknown," in part on the basis of its collective bargaining agreement with the School District.[6]

As of the date of the hearing on the present motions, negotiations between the Receiver and the Unions were continuing but remained in preliminary stages. In a recent status report in the Chapter 9 case, the Receiver indicated that he expects to make a financial offer to the Unions on or before March 21, 2012, and that he expects to know within three weeks thereafter whether he will have reached new and modified collective bargaining agreements with the Unions. In his complaint in this adversary proceeding, the Receiver stated that if he is unable to negotiate collective bargaining agreements with the Unions that would enable the City to operate with balanced budgets for a period of five years, he will move to reject their collective bargaining agreements. He has not yet moved to reject either agreement. The Receiver maintains that before he can file a confirmable plan in this case, the court must resolve the issues as to which he now seeks declaratory relief.

## DECLARATORY RELIEF

The Court must first determine its subject matter jurisdiction and therefore will address the Motion to Dismiss or Abstain before the Motion for Summary Judgment. However, in order to address the issues of jurisdiction, authority, and abstention that are presented by the former motion, it would help first to clarify the relief being demanded and establish whether declaratory relief is appropriate and warranted.

■ The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[7] Bankruptcy courts are among the federal courts that may grant declaratory relief under this statute.[8] And, notwithstanding the inapplicability of Fed. R.Civ.P. 57 to adversary proceedings, the Bankruptcy Rules make provision for entertainment of complaints for declaratory relief in bankruptcy cases.[9]

---

5. Council 94's answer is to the Amended Complaint; it has not answered the Second Amended Complaint, but the operative allegations and demands are the same.

6. Proofs of claim nos. 20–1, 20–2, 21–1, and 21–2.

7. 28 U.S.C. § 2201(a).

8. *Nipon v. Leslie Fay Co. Inc. (In re Leslie Fay Co. Inc.)*, 216 B.R. 117, 134 (Bankr.S.D.N.Y. 1997); *Downington Industrial and Agricultur*

*al School v. Commonwealth of Pennsylvania Dept. of Ed. (In re Downington Industrial and Agricultural School)*, 172 B.R. 813, 819 (Bankr.E.D.Pa.1994).

9. Fed. R. Bankr.P. 7001(9) (adversary proceedings include certain proceedings to obtain a declaratory judgment). The fact that the rules so provide is not a basis for concluding that a bankruptcy court has authority to enter a declaratory judgment, and I do not suggest otherwise. No bankruptcy rule

█ The Declaratory Judgment Act is designed to enable litigants to clarify legal rights and obligations before acting upon them, "whether or not further relief is or could be sought."[10] Despite the availability of this relief before a party is injured or aggrieved, a court may enter declaratory relief only "in a case of actual controversy."[11] An actual controversy is "a case and controversy in the constitutional sense.... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."[12] But even where an actual controversy is presented, the court retains discretion to deny declaratory relief for prudential reasons.[13]

The Receiver contends without elaboration that there exists an actual controversy as to both issues on which he seeks declaratory relief, and the Unions neither contend otherwise nor expressly address the issue. Though the Unions oppose summary judgment, neither has done so on the basis that there does *not* exist an actual controversy or that declaratory relief is not otherwise appropriate. And, although the Teachers' Union has moved to dismiss for lack of subject matter jurisdiction, and lack of an actual controversy would be a defect in subject matter jurisdiction, the Teachers Union does not contend in its motion to dismiss that this adversary proceeding suffers from that particular jurisdictional defect.

Still, the court must satisfy itself that there exists an actual controversy with respect to each question presented and not merely a difference of opinion over hypothetical facts. This in turn requires an understanding of precisely what each question asks and how it affects the rights and legal relations between the Receiver and each Union.

### a. Declaratory Relief as to Count I

█ In his first count, the Receiver seeks a declaration "that the School District is part of the City and therefore, *ipso facto*, the collective bargaining process is within the Bankruptcy Court's subject-matter jurisdiction." By this language, I understand the Receiver to seek a determination in two parts: (i) that the School District is not a separate entity from the City but merely a part or department of the City, and (ii) that because the School District is a part of the City, the debts and contractual obligations of the School District to the Unions are debts and contractual obligations of the City and therefore subject to possible adjustment, especially by rejection, in the City's bankruptcy case. The powers of a municipality in a Chapter 9 case include the power to reject executory contracts.[14] Provided certain conditions

makes Fed.R.Civ.P. 57 applicable in bankruptcy cases or adversary proceedings.

10. 28 U.S.C. § 2201(a); *Ernst & Young v. Depositors Economic Protection Corp.*, 45 F.3d 530, 534 (1st Cir.1995).

11. 28 U.S.C. § 2201(a).

12. *Public Service Com. v. Wycoff Co.*, 344 U.S. 237, 242–243, 73 S.Ct. 236, 97 L.Ed. 291 (1952) (internal quotation marks omitted).

13. *Diaz–Fonseca v. Puerto Rico*, 451 F.3d 13, 27 (1st Cir.2006) and cases cited.

14. 11 U.S.C. § 365(a) (subject to certain exceptions, "the trustee, subject to the court's approval, may assume or reject any executory contract ... of the debtor"), 901 (section 365 of the Bankruptcy Code applies in a case under Chapter 9), and 902(5) ("'trustee,' when used in a section that is made applicable in a case under this chapter by section ... 901 of this title, means debtor"). As a general rule, a contract is "executory" when performance remains due to some extent on both sides. 3 Collier on Bankruptcy ¶ 365.02 (16th ed. 2011); *Ready Prod., Inc. v. Jarvis (In re Jarvis)*, 2005 Bankr.LEXIS 536, 2005 WL

are satisfied, this power of rejection extends to collective bargaining agreements.[15] By seeking a declaration that "the collective bargaining process is within the Bankruptcy Court's subject-matter jurisdiction," the Receiver is not so much interested in the extent of the court's jurisdiction or authority as in the reach of the City's power to reject. Does it extend to the Unions' contracts with the School District?

The Receiver's first count is no broader than this. The Receiver does not in this proceeding move to reject the collective bargaining agreement of either Union; he indicates that he may in the near future move to reject one or both, but in view of the early stage of negotiations with the Unions, he believes that a motion to reject would at present be premature, and the Teachers' Union concurs. (Council 94 has voiced no position on the issue.) Nor does the Receiver seek a declaration that either agreement is executory within the meaning of § 365(a). His interest in this proceeding is simply in establishing that rejection is a possibility, because the Unions' agreements are with the debtor City.

As to both Unions, this controversy and that presented by Count Two are purely legal. The material "facts" are almost all of a legislative nature, and the few remaining material facts that are not of this nature are neither controverted nor developing.

■ With respect to Council 94, the first count presents an actual controversy for three reasons. First, it will determine the possibility of rejection. Council 94's collective bargaining agreement is unexpired and appears to be an executory contract.[16] If it is a contract with the City, not with an independent entity, it would be subject to possible rejection in this case; but if it is not a contract with the City, then rejection under the Bankruptcy Code would not be an option. Second, if Council 94's contract is not with the City, the Receiver will have cause to object to the contract claim asserted by Council 94: that the School District's obligations under the contract are not obligations of the City. Third, in order to formulate a plan of debt adjustment in this case and to understand the feasibility of any plan he does formulate, the Receiver must determine the School District's budget for the projected five-year term of the plan. Under recent amendments to Rhode Island law, the City will, during the term of the plan, be responsible for a small fraction of the School District's budget.[17] The Unions' contracts

758805, *2 (Bankr.D.N.H.2005) (surveying state of law in First Circuit). Rejection has the effect of freeing the debtor from the obligation to perform the contract and leaves the nondebtor party with a claim for breach that is deemed to have arisen immediately before the date of filing of the bankruptcy petition. 11 U.S.C. § 365(g)(1).

15. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (holding, in a chapter 11 case, that collective bargaining agreements are subject to rejection under § 365(a), but the standard of rejection is stricter than the ordinary business judgment standard and requires a showing of reasonable efforts to negotiate a voluntary modification). See also *IBEW, Local 2376 v. City*

of Vallejo (In re City of Vallejo), 432 B.R. 262, 272 (E.D.Cal.2010) (a municipality operating under Chapter 9 may utilize 11 U.S.C. § 365(a) to reject a collective bargaining agreement if the municipality can show that the requirements of *Bildisco* are met). I make no ruling at this time as to the specific requirements for rejection in a Chapter 9 case.

16. I need not and do not make a final ruling on that issue in this adversary proceeding.

17. Over the last 20 years, the State has funded the entire operational budget. Though the fraction for which the City will be responsible is small, the School District's budget is much larger than the City's budget, and even a

together constitute the vast majority of that budget. By determining whether rejection is a possibility, adjudication of the Receiver's first count would hasten the negotiation of the Unions' contracts and the settlement of the School District's budget, and it would thereby shorten the debt adjustment process in bankruptcy and the duration of the City's time in receivership. For each of these reasons, I am satisfied that the first count presents an actual controversy with Council 94 that warrants declaratory relief.

■ As against the Teachers' Union, the existence of an actual controversy is for two reasons less certain: its contract may not be executory, and it has not filed a proof of claim. There is a dispute as to whether the Teachers' contract remains executory—on the one hand the contract has expired, on the other it continues to govern, and the issue has not been raised or briefed. And the Teachers' Union has not filed a proof of claim. Still, there exists at least a reasonable possibility that the contract, if it is deemed a contract with the City, would be deemed executory and subject to rejection. And the Teachers' Union may yet file a proof of claim if the School District is part of the City and its collective bargaining agreement is executory and ultimately rejected. With respect to budgetary concerns, the existence of an actual controversy is more certain: the Receiver's need to move ahead on the Teachers' Union's contract is even more urgent than on Council 94's contract. As the Teachers' Union explained at the hearing, its budget is by far the larger of the two and the most significant item in the School District budget. In addition, where the court has already determined that an

actual controversy exists as to Council 94, there is good cause to consider the same issue as to the Teachers' Union at the same time—the Teachers' Union has shown every indication of wanting to be heard on the issue. The Court therefore concludes that the first count presents an actual controversy with the Unions that warrants declaratory relief.

### b. Declaratory Relief as to Count II

■ By his second count, the Receiver seeks a declaration "that the Receiver has the power under the Fiscal Stability Act to act on behalf of the City relative to collective bargaining with the Unions." As the Receiver himself states, the need for this declaration is contingent on the court's first declaring that the School District is part of the City.[18] By this count, the Receiver seeks a declaration of the scope of his power under Rhode Island's Fiscal Stability Act, pursuant to which he was appointed receiver and by which his powers are established and defined. The Unions have taken the position that the Fiscal Stability Act does not empower the Receiver to collectively bargain with the Unions on the City's behalf. The Receiver contends that the Act does so empower him and that a declaration on this issue is needed so that the parties can proceed with a full understanding of their respective rights.

The court concludes that this count presents an actual controversy as to both Unions. If the School District is part of the City, then both contracts will require renegotiation. Indeed the expiration of the Teachers' Union contract last August would require negotiation of a new agree-

small fraction of the schools' budget could have an appreciable effect on the City's already-stretched finances and may have a material impact on confirmation.

18. Upon a determination that the School District is not part of the City, this second count would become moot.

ment even if the City were not in bankruptcy. A declaration that the Receiver may act for the City in those negotiations plainly will advance the negotiations and the reorganization process in bankruptcy. This controversy, too, warrants declaratory relief.

## MOTION TO DISMISS OR ABSTAIN

■■■ The Declaratory Judgment Act does not itself confer subject-matter jurisdiction. Rather, it makes available a declaratory remedy for disputes that come within the court's jurisdiction on some other basis.[19] The determination that declaratory relief is appropriate does not obviate the need to address the Teachers' Motion to Dismiss or Abstain.

In that motion, the Teachers' Union makes the following four arguments. First, the court's subject-matter jurisdiction is limited to core proceedings, but the Receiver's requests for declaratory relief are not core proceedings within the meaning of 28 U.S.C. § 157(b) (enumerating core proceedings and authorizing bankruptcy judges to hear and determine and enter appropriate orders and judgments in them). Second, even if they are core proceedings, they arise under state law and therefore are not matters on which a bankruptcy judge, lacking life tenure and protection against reduction of salary, may constitutionally enter judgment, a proposition for which the Teachers' Union relies on *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). Third, even if the court does have subject-matter jurisdiction, the court must, under 28 U.S.C. § 1334(c)(2), abstain from adjudicating the adversary proceeding because it arises under state law and can be timely adjudicated in a state forum. And fourth,

even if § 1334(c)(2) does not mandate abstention, the court may and should abstain under § 1334(c)(1) out of respect for state law and for the numerous state parties and state interests in this matter. The Receiver opposes the Union's position at each turn. The court will address the arguments *in order.*

### a. Core Status and Subject–Matter Jurisdiction

The Teachers' first argument has two parts: (i) the court's subject-matter jurisdiction is limited to core proceedings, (ii) but the Receiver's requests for declaratory relief are not core proceedings. For the reasons set forth below, the court agrees that the Receiver's requests are not core and that this renders the bankruptcy court unable to enter a final judgment in the matter but not that subject-matter jurisdiction is lacking.

I begin with the argument that the bankruptcy court's subject-matter jurisdiction is limited to core proceedings. The Teachers' argue without elaboration: "[t]he Court's subject-matter jurisdiction in an adversary proceeding is limited to 'core proceedings arising under title 11, or arising in a case under title 11 . . . .' 28 U.S.C. § 157(b)(1)." The Receiver does not answer this part of the Union's argument.

■■■ Bankruptcy jurisdiction is vested in the first instance in the district courts.[20] The district courts are empowered by 28 U.S.C. § 157(a) to provide "that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."[21] The district

---

19. *Ernst & Young v. Depositors Economic Protection Corp.,* 45 F.3d at 534.

20. 28 U.S.C. § 1334(a), (b), and (e).

21. 28 U.S.C. § 157(a).

court for the District of Rhode Island has done just that.[22] A bankruptcy judge's authority over the matters so referred is not uniform. As to "all core proceedings arising under title 11 or arising in a case under title 11," a bankruptcy judge has authority, regardless of the consent of the parties, to hear and determine and enter appropriate orders and judgments.[23] As to all other referred matters, however, a bankruptcy judge may not, without the consent of the parties—the Unions have indicated that they do not consent—determine such matters and enter final orders or judgments.[24] Still, a bankruptcy judge is expressly permitted to hear these non-core matters.[25] However, when a bankruptcy judge does hear such a matter, he or she "shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."[26] Therefore, it is inaccurate to state that outside of core proceedings, a bankruptcy judge lacks subject-matter jurisdiction. Neither Congress by statute nor the Supreme Court in *Stern v. Marshall* or otherwise has so limited the jurisdiction of a bankruptcy judge. Provided the matter in question is related to a bankruptcy case—the present matters unques-

tionably are—it remains within the subject-matter jurisdiction created in § 1334 and referred to the bankruptcy court under § 157(a). The bankruptcy judge retains authority to hear and enter proposed findings and conclusions in the matter, with judgment to enter finally in the district court.

█ The next issue is whether the Receiver's requests for declaratory relief are core. The Court must make this determination for each request for declaratory relief. The Teachers' Union argues that the requests for declaratory relief are not core because they are not among the core proceedings that are enumerated in 28 U.S.C. § 157(b)(2), do not invoke a substantive right created by federal bankruptcy law, arise entirely under state law, could exist independently outside of bankruptcy, and could proceed in another court in the absence of a bankruptcy case. The Receiver contends that both declaratory requests are core for the following reasons: they fall within two of the enumerated categories of core proceedings—"matters concerning the administration of the estate" § 157(b)(2)(A), and "other proceedings affecting . . . the adjustment of the debtor-creditor . . . relationship," § 157(b)(2)(O)—because they are related to the rejection of executory contracts; they will "determine who the debtor is"

22. DRI LR Gen 109(a) ("All cases arising under Title 11 shall be referred automatically to the bankruptcy judge(s) of this District."). Though I am a bankruptcy judge of the District of Massachusetts, by designation under 11 U.S.C. § 921(b), I am a bankruptcy judge of the District of Rhode Island for this bankruptcy case. See Designation Order, Case No. 11–13105 (Bankr.D. R.I.), Doc. # 2.

23. 28 U.S.C. § 157(b)(1) ("Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred

under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.").

24. 28 U.S.C. § 157(b)(1) and (c).

25. 28 U.S.C. § 157(c)(1) ("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11.").

26. 28 U.S.C. § 157(c)(1). See also Fed. R. Bankr.P. 9033 and DRI LR Gen 109(d).

and thereby determine the extent of the bankruptcy court's subject matter jurisdiction in this bankruptcy case, an issue a bankruptcy court always has jurisdiction to determine; they will affect various core matters, including especially by determining whether creditors of the School District are creditors of the City; and they will clarify whether the City may move to reject the collective bargaining agreement with the School District.[27]

The term "core proceeding" is used in 28 U.S.C. § 157(b) to refer to those matters a bankruptcy judge may hear, determine, and dispose of by appropriate orders and judgments, subject only to appellate review. Subsection 157(b) provides a nonexhaustive list of core proceedings, including two catch-all categories on which the Receiver relies: "matters concerning the administration of the estate," § 157(b)(2)(A), and "other proceedings affecting . . . the adjustment of the debtor-creditor . . . relationship," § 157(b)(2)(O). The first of these, "matters concerning the administration of the estate," cannot apply in a Chapter 9 case because Chapter 9 cases involve no estate.[28] Section 157 does not otherwise define "core proceeding" except by dictating that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." 28 U.S.C. § 157(b)(3). "It is the nature of the proceeding—its relation to

the basic function of the bankruptcy court—not the state or federal basis for the claim, that makes the difference here."[29] The legislative history of 28 U.S.C. § 157 indicates that "Congress intended that 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits."[30] Proceedings under 11 U.S.C. § 365(a) to assume or reject executory contracts, arising as they do under the Bankruptcy Code and being unavailable outside of bankruptcy, "affect the adjustment of the debtor-creditor relationship" within the meaning of § 157(b)(2)(O) and therefore are undisputedly core proceedings.[31]

As the Teachers' Union rightly points out, however, the Receiver's demands for relief include no motion under § 365(a) of the Bankruptcy Code to reject an executory contract. Nor do they seek a determination that the Unions' collective bargaining agreements are executory or even that they are contracts with the City. The Receiver's first count—for a declaration that the School District is part of the City—stops short of putting the Unions' collective bargaining agreements in controversy at all. It follows that, however useful the requested declaration may be, both in structuring negotiations and possibly in narrowing issues in future litigation, this adversary proceeding cannot itself definitively determine any consequence of the requested declaration for the relationship

---

**27.** The Receiver's position on this issue is set forth not only in his brief in opposition to the Motion to Dismiss or Abstain but also in his brief in support of his Motion for Summary Judgment.

**28.** The section of the Bankruptcy Code that creates a bankruptcy estate is § 541(a), but that section does not apply in cases under Chapter 9. 11 U.S.C. § 901(a) (listing Code sections that apply in a chapter 9 case); 11 U.S.C. § 103(f) ("Except as provided in section 901 of this title, only chapters 1 and 9 of

this title apply in a case under such chapter 9.").

**29.** *Arnold Print Works v. Apkin (In re Arnold Print Works)*, 815 F.2d 165, 169 (1st Cir. 1987).

**30.** *Id.* at 168–69.

**31.** *In re Texaco, Inc.*, 77 B.R. 433, 437 (Bankr.S.D.N.Y.1987); *In re UAL Corp.*, 293 B.R. 183, 184 (Bankr.N.D.Ill.2003).

between the City and the Unions. In addition, the first count arises entirely under state law, not under the Bankruptcy Code; and though it arises in a bankruptcy case, it could as easily have arisen, and been brought elsewhere, had the City not commenced this bankruptcy case. The Receiver is correct in stating that Count One may have consequences for numerous core matters in this case, including the rejection of contracts, the litigation and adjustment of claims, and the extent of the automatic stay. Still, it is not enough that the declarations he requests may affect these. What is dispositive here is that the declarations would not themselves determine any core matter.[32]

The Receiver has characterized his first count as one to determine who is the debtor and, consequently, to determine the extent of the bankruptcy court's subject matter jurisdiction. This characterization is not quite apt. The debtor in this case is the City of Central Falls, and "the court's jurisdiction"—by which the Receiver means the City's power in bankruptcy, subject to court approval, to adjust debts and contractual obligations— extends to all contractual obligations and other debts of the City. That much is clear and undisputed. The real issue in dispute, which Count One bears upon *but would not actually determine*, is whether the Unions' collective bargaining agreements are executory contracts with the City, in which case those contracts would be subject to adjustment under § 365. Were this a proceeding to determine that the contractual obligations of the School District to the Unions are obligations of the City under executory contracts, it would have a much stronger claim to core

status. This would then be a proceeding to determine that certain obligations are subject to adjustment in the bankruptcy case. But the Receiver's first count stops short of this and therefore is non-core. It is merely "related to" this bankruptcy case within the meaning of 28 U.S.C. § 157(c)(1), and the bankruptcy judge's authority over it is therefore limited to that in § 157(c)(1).

■ The second count's claim to core status is no stronger than the first's. The second count seeks a determination of the authority of the Receiver under the Fiscal Recovery Act, the state statute that delimits his authority. Like the first it arises entirely under state law and, though it arises in this bankruptcy case, could have arisen and been brought elsewhere had the City not sought bankruptcy relief. It too is related to this case, and its determination is important to the progress of this case, but it is not core.

### b. *Stern v. Marshall*

The Teachers' Union next argues that even if the declaratory judgment counts are core, the Supreme Court's recent decision in *Stern v. Marshall*, —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), precludes the bankruptcy court from entering final judgment on them. In *Stern*, the Supreme Court held that Congress violated Article III of the United States Constitution in 28 U.S.C. § 157(b) by assigning to bankruptcy judges—judges lacking life tenure and protection against diminution of salary—for final adjudication as a core proceeding a counterclaim by the bankruptcy estate against a creditor who asserted a claim against the estate where

---

**32.** To be sure, it likely would bear upon, even have issue-preclusive effect in, certain core proceedings, such as a motion to reject the Unions' collective bargaining agreement or an objection to the claim of Council 94. But its preclusion would go only to discrete issues, not to the core matter itself: collateral estoppel but not res judicata. Moreover, until a core proceeding is commenced, the Court cannot know the full range of issues that can and will be raised or the importance of this one issue to resolution of the core proceeding.

resolution of the counterclaim was not necessarily resolved in the process of adjudicating the creditor's proof of claim. In the discussion above, this court has already decided that the declaratory judgment counts are not core and therefore that, lacking the Unions' consent, the bankruptcy court may not enter final judgment but is limited to hearing the matter and submitting proposed findings and rulings to the district court, with judgment to be entered by the district court. When asked at hearing whether such a conclusion—specifically, a determination that the claims at issue are merely "related to" and not core—would render the present argument moot, the Teachers' Union said it would not; but counsel could not explain why, except to state that, in *Stern*, the Supreme Court signaled that "the bankruptcy courts need to carefully consider whether they should be deciding certain types of purely state law questions." [33]

■ I understand the Teachers' Union to be arguing that *Stern* somehow invalidates the procedure prescribed in 28 U.S.C. § 157(c)(1) for a matter that is not a core proceeding but that is otherwise related to a bankruptcy case and that arises entirely under state law. *Stern* provides no support for this reading. *Stern* concerned only the authority of a bankruptcy court, as a court whose judges lack the full protections of Article III, to enter

certain final judgments, and it rested exclusively on a separation-of-powers rationale. It did not address the validity of a judgment entered by the district court, whose Article III credentials the Teachers' Union does not dispute, pursuant to the process set forth in 28 U.S.C. § 157(c)(1). Nor did it address concerns of federalism; although the counterclaim at issue in *Stern* arose under state law, the determinative feature of that counterclaim was that it did not arise under the Bankruptcy Code. The operative dichotomy was not federal versus state, but bankruptcy versus nonbankruptcy. The Teachers' Union has offered no reason why *Stern* should affect the validity of § 157(c)(1) procedures and judgments. In *Stern* itself, the Supreme Court indicated that the fault it found was limited to "one isolated respect" of the bankruptcy jurisdictional scheme in § 157 [34] and that its decision did not meaningfully change the division of labor in the statute.[35] I am satisfied that *Stern* had no effect on § 157(c)(1) and that a bankruptcy judge may hear the Receiver's declaratory judgment complaint and propose findings of facts and conclusions of law on its two counts.

### c. Mandatory Abstention, 28 U.S.C. § 1334(c)(2)

■ In the alternative, the Teachers' Union argues that 28 U.S.C. § 1334(c)(2)

---

**33.** Nowhere does the Teachers' Union specify precisely what type of state law question its argument is concerned with.

**34.** *Stern v. Marshall*, 131 S.Ct. at 2620.

**35.** *Id.* The court stated:

As described above, the current bankruptcy system also requires the district court to review de novo and enter final judgment on any matters that are "related to" the bankruptcy proceedings, § 157(c)(1), and permits the district court to withdraw from the bankruptcy court any referred case, proceeding, or part thereof, § 157(d). Pierce

has not argued that the bankruptcy courts "are barred from 'hearing' all counterclaims" or proposing findings of fact and conclusions of law on those matters, but rather that it must be the district court that "finally decide[s]" them. We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a "narrow" one.

*Stern v. Marshall*, 131 S.Ct. at 2620 (internal citations omitted).

requires that the court abstain from adjudicating the Receiver's complaint. Section 1334(c)(2) states:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.[36]

This subsection applies by its terms to a district court exercising bankruptcy jurisdiction under § 1334 and, by operation of 28 U.S.C. §§ 151 and 157(a), to a bankruptcy court acting upon a bankruptcy matter by reference under § 157(a).[37] Section 1334(c)(2) mandates that a court abstain if five conditions are satisfied: (1) the proceeding is based on a state law claim or cause of action; (2) the claim or cause of action is related to a case under title 11 but does not arise under title 11 and does not arise in a case under title 11; (3) federal courts would not have jurisdiction over the claim but for its relation to a bankruptcy case; (4) an action "is commenced" in a state forum of appropriate jurisdiction; and (5) the action can be timely adjudicated in that state forum.[38] The Teachers' Union contends all five are satisfied. The Receiver opposes abstention, contending principally that timely adjudication cannot be had in another forum.

Two of the five conditions appear to be satisfied here: the proceeding is based on a state law claim or cause of action—it seeks a declaration of rights and relations under Rhode Island law; and the federal courts would not have jurisdiction over the claim but for its relation to a bankruptcy case. However, at least one other, timely adjudication, is not satisfied, and therefore abstention is not mandatory.[39]

The matters cannot be "timely" adjudicated in a state forum of appropriate jurisdiction. What constitutes "timely" adjudication is a function of the needs of the reorganization process. Here, the Receiver expects to be in a position to complete negotiations with the Unions before mid-April. The completion of these negotiations, and the resolution of the status of the City's obligations to the Unions (if any), are the last matters he must address before submitting an amended plan of reorganization on which the Receiver hopes to proceed to confirmation. The Receiver's goals, shared by the court, are to resolve the bankruptcy process and then complete his receivership in a much shorter time than the usual span of litigation outside of bankruptcy and, indeed, in other Chapter 9 adjustment cases. This goal is driven in part by the cost of the reorganization process, which increases with its length and at some point jeopardizes the reorganization itself. It is also driven by the need to complete the receivership process and return the City to municipal normalcy. The Rhode Island Supreme Court

---

**36.** 28 U.S.C. § 1334(c)(2).

**37.** The bankruptcy judges in a federal judicial district "constitute a unit of the district court" for that district. 28 U.S.C. § 151.

**38.** *Stoe v. Flaherty,* 436 F.3d 209, 213 (3d Cir.2006).

**39.** The court also questions whether this matter "does not arise in a case under title 11" and that a matter "is commenced" when it has not already been commenced. Where the timeliness requirement is not satisfied, these concerns are academic and need not be addressed.

has itself recognized this imperative with respect to the receivership of Central Falls.[40] The Receiver filed his complaint in this adversary proceeding on December 30, 2011, and asked for disposition of the matter by March 2, 2012. After hearing from the Unions, and at their request, I enlarged that time by approximately a month but generally agreed with the Receiver's appraisal of the matter's urgency and with the timeline on which it should be decided.

The matter would not likely be adjudicated in the state courts within the time that this bankruptcy case requires. The bankruptcy courts are designed and intended to handle all matters in a bankruptcy case precisely to make reorganization more feasible and to advance matters whose adjudication is critical to the progress of the case. A state court would be receiving this matter without the bankruptcy court's sense of the whole case in which it is situated, on a docket already crowded with other matters. And it takes nothing away from the state courts to observe that the usual course of civil litigation is vastly longer in duration than this matter requires: weeks, not months or years.[41]

I am mindful that the bankruptcy court itself cannot finally decide this matter. Under § 157(c)(1), further process will be required in the district court before final judgment can enter. Even so, I find and conclude that adjudication of this matter in the bankruptcy court pursuant § 157(c)(1) is the option most likely to result in a timely adjudication. For these reasons, abstention is not mandatory.

### d. Discretionary Abstention, 28 U.S.C. § 1334(c)(1)

In the alternative, the Teachers' Union argues that the bankruptcy court may and should, in the interest of respect for state law, abstain under § 1334(c)(1) from adjudicating this matter. The Union argues that the court should abstain because the issues presented arise entirely under state law and are of particular importance to the state but will have little or no consequence in this bankruptcy case. The Receiver opposes discretionary abstention, arguing that abstention is disfavored and would impede the efficient administration of the case, that the issue presented is important to the bankruptcy case, and that although the questions arise under state law, established Rhode Island law already answers the questions.

Where abstention is not mandatory under § 1334(c)(2), subsection (c)(1) nonetheless permits a court to abstain from hearing a matter related to a bankruptcy case in the "interest of justice" or "in the interest of comity with State courts or respect for State law." 28 U.S.C.

---

**40.** See *Moreau v. Flanders*, 15 A.3d 565, 576–79 (R.I.2011) (indicating concern about the absence of an explicit sunset provision in the framework of Rhode Island's municipal receivership statute and stating that "it would seem that a period of oversight that exceeds two years from the appointment of a receiver might be unreasonable").

**41.** At the hearing on this motion, the court explored with the parties the possibility of certifying key questions in this adversary proceeding to the Rhode Island Supreme Court, an unusual procedure. The court did this in part because the Unions cited the speed with which that court heard and decided other litigation concerning the City's receivership. By the end of the hearing, however, it was clear that even that pace, which is veritable alacrity at the appellate level, would not meet the needs of this case. And this court cannot know in advance whether the Supreme Court would even agree to address the question and, if so, how soon. Where the Supreme Court's calendar is closed for this term, it is unclear that the matter could even be heard before October.

§ 1334(c)(1). Courts have developed a comprehensive list of the relevant considerations:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties.[42]

"Courts should apply these factors flexibly, for their relevance and importance will vary with the particular circumstances of each case, and no one factor is necessarily determinative." [43]

▉ Several of these factors undisputedly weigh heavily in favor of abstention. First, the state issues predominate; both parties do also advance arguments under federal law, but at bottom both declaratory requests are about state law. Second, unlike many state law issues that are routinely litigated in bankruptcy court—regarding contracts, security interests, exemptions, property rights, and the like—the issues presented here are unusual and not well-trodden. Third, the issues concern the structure of state and municipal government and its financing and are thus of special concern to the State of Rhode Island, its municipalities, and its various authorities. And fourth, those authorities are necessary parties in this proceeding. Respect for state law is therefore of greater than usual importance here, a significant concern.[44]

The force of this concern is blunted by other factors. Though the state issues are not well-settled, they do not come to this court without determinative signposts in state law; this court would not be making state law out of whole cloth. In addition, answers to declaratory requests can and would be framed narrowly. And, though the Governmental Defendants are present in this proceeding as necessary third parties, they have taken no position on the substantive issues and have not requested dismissal or abstention but rather, in each of their answers, have *requested* the judgment of this court.

Moreover, there are two countervailing concerns. The first is the importance of these issues to the bankruptcy case. If the School District is part of the City, then its contracts may be subject to adjustment in this case. The Teachers' Union argues that "the City is not a party to the Unions' contracts and cannot reject them," and

---

42. *In re Chicago, M. & St. P. & Pac. R.R.,* 6 F.3d 1184, 1189 (7th Cir.1993); see also *In re Middlesex Power Equip. & Marine, Inc.,* 292 F.3d 61, 69 (1st Cir.Mass.2002) (citing court's "broad discretion to abstain" and citing to lists of factors employed in other circuits).

43. *In re Middlesex Power Equip. & Marine, Inc.,* 292 F.3d 61, 69.

44. *Id.* ("because section 1334(c)(1) is concerned with comity and respect for state law, whether a case involves unsettled issues of state law is always significant").

therefore that the declaratory judgment issues cannot have a meaningful impact on the bankruptcy case. This argument puts the cart before the horse. The purpose of this adversary proceeding is, in effect, to determine whether the City is a party to the contracts. The Receiver's ability to reject those contracts, and by extension to negotiate with authority concerning them, is hardly settled. The Teachers' Union also contends that the issues presented cannot meaningfully affect the City's bankruptcy case for the further reason that the net effect of rejection of the Unions' contracts on the City would be negligible because the State will still fund over 95% of the School District's operating costs over the next five years.[45] But the Teachers' Union concedes that the School District budget dwarfs the balance of the City's budget—the figures cited to the court were $44 million for the School District and $17.5 million for the balance of the City. It follows that even a small fraction of the School budget can have a significant effect on the City's overall ability to make ends meet and to propose a feasible plan. But even this point misses the big picture: the City's receipt of budgetary assistance from the State is not a reason the City should not use the resources at its disposal in this case to get its budget under control. Control of the budget is self-justifying, even for those portions of the budget that the State has and may in the future subsidize in part or even in full. The availability of life-support is not justification for *not* curing the disease that necessitates it. The City has every reason to diminish the extent of its necessity, and that in itself is

a legitimate goal in this case. Therefore, the issues presented are of fundamental importance in this bankruptcy case.

The second countervailing concern is the need for expedition. For reasons explained above, sending this matter to state court would likely delay this case for much longer than the reorganization effort can tolerate or, more likely, force the Receiver to proceed without a resolution of this issue, which would effectively compromise some or all of his legitimate objectives in this case, or both.[46] In short, determination of these issues by the state courts is not a realistic option. The real options are determination in the present proceeding or not at all. For all these reasons, the better course is not to abstain. The Court therefore turns to the Motion for Summary Judgment.

## MOTION FOR SUMMARY JUDGMENT

### Standard of Review

■ Summary judgment is appropriate when there is no genuine issue of material fact and, on the uncontroverted facts, the moving party is entitled to judgment as a matter of law.[47] Where, as here, the burden of proof at trial would fall on the party seeking summary judgment, that party must support its motion with evidence—in the form of affidavits, admissions, depositions, answers to interrogatories, and the like—as to each essential element of its cause of action. The evidence must be such as would permit the movant at trial to withstand a motion for directed verdict

---

**45.** Five years is the term of the plan of debt adjustment the City contemplates filing in this case.

**46.** Compromise is part of bankruptcy, and there has been a fair measure of it in this case already, but it should not be necessitated by inability to timely adjudicate a matter, espe-

cially when there exists a forum that can accomplish that.

**47.** Fed.R.Civ.P. 56, made applicable by Fed. R. Bankr.P. 7056; *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 763 (1st Cir.1994).

under Fed.R.Civ.P. 50(a).[48] Provided it does so, the burden then shifts to the opposing party to adduce evidence that establishes a genuine issue of material fact as to at least one essential element of the moving party's case. The Court must view all evidence in the light most favorable to the nonmoving party and indulge all inferences favorable to that party.[49] The ultimate burden of proving the absence of a genuine issue of material fact remains at all times on the moving party. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[50] Absent a genuine dispute of material fact, questions of law are appropriate for resolution on summary judgment.[51] Questions of statutory interpretation are questions of law.[52]

The court adjudicates this motion for summary judgment in a proceeding in which it must make "proposed findings of fact." To be clear, a motion for summary judgment involves no findings of fact, merely (insofar as facts are concerned) rulings of law as to whether there exist genuine issues as to the material facts. The following facts are not findings of the court.

## Facts

The facts as the court must construe them are as follows. Except where otherwise indicated, they are either admitted or otherwise uncontroverted.[53]

1. The plaintiff City is a municipality of the State of Rhode Island (the "State") and a political subdivision thereof.

2. On August 1, 2011, the City filed a voluntary petition under Chapter 9 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Rhode Island, commencing the Chapter 9 case in which this adversary proceeding arises.

3. On December 1, 2011, the Court entered an order for relief in the Chapter 9 case.

4. Defendant Central Falls Teachers' Union (the "Teachers' Union") is a labor

---

**48.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**49.** *Daury v. Smith,* 842 F.2d 9, 11 (1st Cir. 1988).

**50.** *Martinez–Rodriguez v. Guevara,* 597 F.3d 414, 419 (1st Cir.2010), quoting from *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**51.** *Zehner v. Central Berkshire Regional School Dist.,* 921 F.Supp. 850, 857 (D.Mass.1995) (citing to *Jimenez v. Peninsular & Oriental Steam Nav. Co.,* 974 F.2d 221, 223 (1st Cir. 1992)).

**52.** See *Hernandez–Miranda v. Empresas Diaz Masso, Inc.,* 651 F.3d 167, 170 (1st Cir.2011); *Simmons v. Galvin,* 575 F.3d 24, 30 (1st Cir. 2009) ("questions of statutory interpretation are questions of law ripe for resolution at the pleadings stage").

**53.** The parties followed the procedure set forth on DRI LR Cv 56(a), made applicable to this proceeding by R.I. LBR 1001–1(b). Accordingly, the City filed a Statement of Undisputed Facts with its motion for summary judgment. The Teachers' Union responded with a Statement of Disputed Facts and also filed a further Amended Statement of Undisputed Facts, to which the City responded with a Statement of Disputed Facts. Except as otherwise noted, the numeration through ¶ 43 corresponds to that in the City's Statement of Undisputed Facts. Council 94, which on the whole relies on the Teachers' Union's response to the Motion for Summary Judgment, nonetheless filed a short separate response from that of the Teachers' Union to the City's Statement of Undisputed Facts. It states only that "[Council 94] has reviewed the Statement and disagrees that Paragraphs 22, 42 and 43.(sic) In addition, [Council 94] defers to the pleadings filed by the [Teachers' Union]." Council 94 cited no evidentiary basis for controverting paragraphs 22, 42, and 43.

union that, at present and since 1967, is and has been the exclusive bargaining agent for all classroom teachers and eligible certified personnel of the Central Falls School District (the "School District"). The Teachers Union has approximately 287 members, who include prekindergarten through grade 12 teachers, certified school nurse teachers, deans, guidance counselors, school librarians, department chairs, temporary certified employees, speech pathologists, coaches, social workers, school psychologists, and certain part-time certified district staff. The principal office of the Teachers' Union is located in Lincoln, Rhode Island.[54]

5. Defendant Rhode Island Council 94, AFSCME, AFL–CIO Local 1627 ("Council 94"), a labor union, is the bargaining unit for certain Central Falls non-teacher, non-certified school employees. Its principal place of business is in North Providence, Rhode Island.[55]

6. The Council 94 employees participate in the Rhode Island Municipal Employees' Retirement System.

7. All state employees and teachers are required under Rhode Island law, R.I. Gen. Laws § 36–9–2, to participate in the Employees Retirement System of the State of Rhode Island ("ERSRI").

8. Non-state employees and non-teachers are not permitted to be members of the ERSRI.

9. In 1952, the City adopted a home-rule charter that designated the City's school committee as one of the independent boards and commissions responsible for performing the executive and administrative work of the city.

10. On March 26, 1991, the governor of Rhode Island and the State commissioner of elementary and secondary education entered into a Memorandum of Understanding with the mayor of Central Falls and the chairmen of the Central Falls City Council, the Central Falls School Committee, and the Central Falls Review Commission. The Memorandum of Understanding contemplated a full state administrative and financial takeover of the Central Falls school system, beginning on July 1, 1992.

11. The Memorandum of Understanding set forth that the Proposed Agreement was expressly subject to certain terms and conditions, one of which was General Assembly approval.

12. In 1991, the Rhode Island General Assembly (the "General Assembly") passed legislation, 1991 R.I. Pub. Laws ch. 312 (the "1991 Act"). The 1991 Act provided for (i) shared funding of the School District by the State and the City for fiscal year ending June 30, 1992, and (ii) a shifting of the administration of the City's schools to a state administrator who was granted the same powers and duties afforded to the school committee. Specifically, the 1991 Act provided as follows:

Section 2. *State Administrative Takeover of Central Falls School District July 1, 1991.* The state administrative takeover of the Central Falls school system, to begin on July 1, 1991, shall be accomplished in the following manner:

(a) the governor, in consultation with the commissioner of elementary and secondary education, shall appoint a special state administrator for the Central Falls school system.

(b) The special state administrator shall have all the rights, responsibilities,

---

54. The facts in this paragraph include the uncontroverted facts from the Teachers' Unions Statement of Undisputed Facts, ¶ 1.

55. The facts in this paragraph include the uncontroverted facts from the Teachers' Unions Statement of Undisputed Facts, ¶ 2.

duties and obligations afforded to school committees under the applicable law and regulation of the state.

(c) The special state administrator will report to the commissioner, seek community input from a nine (9) member Central Falls advisory group, and shall provide regular briefings to the mayor of Central Falls.

(d) The special state administrator shall plan a complete state financial and administrative takeover of the Central Falls school system, commencing July 1, 1992.

Section 3. *Central Falls School District Advisory Group.* The commissioner of elementary and secondary education is hereby directed to solicit nominations for persons to serve on the Central Falls advisory group for the period July 1, 1991 to June 30, 2002. All persons except the special state administrator shall serve without compensation. The board of regents shall appoint the members of the advisory group from nominations made by the commissioner. The advisory group shall meet monthly, shall select a chairman, and shall advise and assist the special state administrator on matters relating to the complete takeover of the Central Falls school district. The special state administrator and the superintendent of schools shall serve as ex-officio, non-voting members of this advisory group.

Section 4. *Administrative plan of the Central Falls School District period of July 1, 1991 to June 30, 1992.*

(a) During the fiscal year 1992, the operation of the Central Falls school

district shall continue in the same manner as in prior fiscal years except as herein provided.

(b) The special state administrator shall replace the school committee as provided in this act.

(c) Collective bargaining agreements currently in force shall remain in effect through June 30, 1992.

(d) The city of Central Falls shall continue to be responsible for payment of all bond principal and interest.

(e) The city of Central Falls shall continue to be the fiscal agent for the Central Falls school district, except that a separate interest-bearing checking account shall be established for the school district. Only expenses incurred after July 1, 1991 shall be paid from this account; provided, further, the incurring and payment of expenses shall be subject to the prior approval of the special state administrator or his/her designee. The account shall contain the revenues to be provided in accordance with section 1 of this act. In accordance with federal regulations, federal funds shall be deposited in a non-interest bearing checking account, and shall be subject to the conditions set forth in this act.

Section 5. Nothing contained in this act shall be interpreted to restrict the commissioner or the special state administrator from fulfilling their duties regarding the Central Falls school system.

12.1 The School District has been overseen by the Rhode Island Department of Education since July 1, 1991.[56]

---

56. Teachers' Union's Statement of Undisputed Facts, ¶ 3. The Teachers' Union's evidence, consisting of a portion of the Report of Receiver Mark A. Pfeiffer (predecessor to Robert Flanders in the Central Falls Receivership),

does not indicate the manner or capacity the School District was overseen by RIDE in this period. RIDE has oversight responsibilities for all school districts and presumably did so even before this period began. The evidence

13. Under the 1991 Act, the City retained the legal obligation to pay debt service on bonds for school buildings.

14. Section 4 of the 1991 Act set forth an administrative plan for the School District for the period of July 1, 1991, to June 30, 1992. It stated that "the city of Central Falls shall continue to be the fiscal agent for the Central Falls school district, except that a separate interest-bearing checking account shall be established for the school district." 1991 R.I. Pub. Laws ch. 312, § 4(e).

15. In 2002, the General Assembly passed an act, 2002 R.I. Pub. Laws ch. 204 (the "2002 Act"), codified at R.I. Gen. Laws § 16–2–34. The 2002 Act replaced the state administrator created by the 1991 Act with a board of trustees appointed by the commissioner of the department of elementary and secondary education, subject to the approval of the Rhode Island board of regents for elementary and secondary education. In part, § 16–2–34 states:

(a) There is hereby established a seven (7) member board of trustees, which shall govern the Central Falls School District. With the exception of those powers and duties reserved by the commissioner of elementary and secondary education, and the board of regents for elementary and secondary education, the board of trustees shall have the powers and duties of school committees.

(b) The board of regents for elementary and secondary education shall appoint the members of the board of trustees from nominations made by the commissioner of elementary and secondary education. The chairperson shall also be selected in this manner. The board of regents shall determine the number, qualifications, and terms of office of members of the board of trustees, provided however, that at least four (4) of the members shall be residents of the city and parents of current or former Central Falls public school students. The remaining three (3) shall be appointed at large.

(f) [ ]The board of trustees shall have … the following powers and duties: … (3) to appoint a superintendent to serve as its chief executive officer[.] …

(j) The appointment of the special state administrator for the Central Falls School District and the Central Falls School District Advisory Group, created by chapter 312 of the Rhode Island Public Laws of 1991, will no longer be in effect upon the selection and appointment of the board of trustees created in this section. All powers and duties of the special state administrator and the Central Falls School District Advisory Group are hereby transferred and assigned to the board of trustees created in this section, upon the selection and appointment of that board.

R.I. Gen. Laws § 16–2–34(a), (b), (f), and (j).[57]

does not indicate whether and how this oversight differed from its oversight of this and other school districts before and after the 1991 Act. It appears from the Report that Receiver Pfeiffer was referring special oversight authority put in place by the 1991 Act, and continued thereafter in succeeding legislation, and I construe this evidence to refer to

those changes, the details of which are specified in the 1991 Act.

**57.** The Receiver contends that it is established and uncontroverted that the members of the board of trustee are not subject to removal by the commissioner. The Teachers' Union admits this but contends that neither are the members of the board of trustees subject to

15.1 Effective July 1, 2003, the Board of Regents approved the School District's first Board of Trustees. Since then, all members of the Board of Trustees have been appointed pursuant to § 16–2–34(b). This system of State control makes the School District unique in all of Rhode Island.[58]

15.2 Whereas, under the revised City Charter currently in effect, the Mayor and the City Council members must be legal residents of the City "for at least two years" § 16–2–34(b) as amended by the 2002 Act requires that only four of the seven members of the Board of Trustees must be City residents. Of the six current members of the Board of Trustees, only three are City residents.[59]

15.3 The Teachers' Union states that it is established and uncontroverted that § 16–2–34, as amended by the 2002 Act, was not repealed by the 2007 amendment to the City Charter and has not been subsequently repealed.[60] The City responds that this is not an appropriate statement of fact but a disputed conclusion of law for the court to determine. The court agrees with the City.

15.4 The Board of Trustees continues to operate the School District pursuant to § 16–2–34.[61]

15.5 The Teachers' Union states that there is evidence that the School Commit- tee has ceased to exist since 1991, but the evidence is a statement in the affidavit of Jane Sessums, who makes the statement on the basis of the 1991 Act, and therefore this is merely a legal conclusion, and a disputed one.[62]

16. The 2002 Act did not alter the provisions of P.L. 1991, ch. 312 regarding the City's obligation to pay debt service on bonds or the City's status as fiscal agent.

17. The City remains obligated to pay debt service on bonds for school buildings. There is evidence in the record that the State reimburses the City for 97 percent of the principal and interest the City must pay on school bonds and school construction bonds. There is also evidence in the record that the amount the Receiver expects the City to pay in connection with principal and interest on bonds from fiscal year 2012 to fiscal year 2016 will be offset by between 70% and 80% per year by State reimbursement.

18. Payments for the debt service on bonds for school buildings were accounted for in the City's initial Plan of Debt Adjustment filed with the bankruptcy court on September 22, 2011.

19. In November 2006, the electors of the City approved amendments to its home-rule charter that had been proposed by the City Council.[63] The amendments deleted certain sections of the pre-amend-

removal by the City. Both positions are conclusions of law, not statements of fact.

58. Teachers' Union's Statement of Uncontested Facts, ¶ 9.

59. Teachers' Union's Statement of Uncontested Facts, ¶¶ 11 and 12.

60. Teachers' Union's Statement of Uncontested Facts, ¶ 13.

61. Teachers' Union's Statement of Uncontested Facts, ¶ 14.

62. Teachers' Union's Statement of Uncontested Facts, ¶ 14.

63. In conjunction with the motion for summary judgment, the Receiver and Teachers' Union each originally submitted isolated excerpts from published editions of the original and amended charters. The Court then ordered the parties to submit full copies of both the original charter and the amended, and the Receiver and both Unions did so in a single document entitled Collective Submission of City Charters. Facts ¶ 19 is a description of the relevant portions of the texts so produced.

ment charter (which had itself been adopted in 1952): § 3–608(1), which had addressed the composition of the school committee [64]; § 3–608(2), which had addressed the filling of vacancies on the school committee [65]; and § 3–608(3), which had addressed the qualifications of school committee members.[66] In the amended charter, § 3–608 was simply marked "reserved," without specific content. The amendments also redacted § 3–100(c), the section that created certain independent boards and commissions, by deleting the school committee from that list.[67] They also deleted in its entirety Chapter 14 of Article IV; Article IV is entitled Executive and Administrative Branch Powers and Duties, and Chapter 14 had been the chapter (comprising seven sections) that governed the school board. In the amended charter, Chapter 14 is now marked "reserved." However, the amendments left in place §§ 6–107 and 6–108, both of which appear in Article VI of the Charter, entitled "Municipal Elections." [68] Section 6–

---

**64.** Section 3–608(1), entitled "The school committee," stated:

The school committee shall consist of five members, one of whom shall be elected from each of the five wards as the same are now constituted. The terms of members of the school committee shall begin on the first Monday of January following the year in which they were elected, except that a member elected to fill a vacancy shall serve for the balance of the unexpired term. At the municipal election in 1953, a member from the first ward shall be elected for a term of two years, a member from the second ward and a member from the third ward for a term of four years, a member from the fourth ward and a member from the fifth ward for a term of six years. At each municipal election thereafter, there shall be elected for a term of six years a member of the school committee to replace the one whose term shall be expiring.

**65.** Section 3–608(2), entitled "Vacancies," stated:

In case of death, resignation, or inability to serve, or removal from the ward from which he was elected, of any member of the school committee, of if for any other cause there shall be a vacancy in the membership of the committee, a majority of the members of the school committee may appoint, as a member of said committee, a person who at the time of his appointment shall be a qualified elector in the ward where such vacancy occurs. Such persons shall hold office as a member of the school committee until the first Monday in January, succeeding the municipal election, next following his appointment, at which election the unexpired term shall be filled by the electors of the ward so affected.

**66.** Section 3–608(3), entitled "Qualifications of members of the school committee," stated in its entirety: "Members of the school committee, at the time of their elections, shall be qualified electors of and residents of the respective ward from which they are elected."

**67.** Section 3–100(c) stated: "The executive and administrative work of the city shall be performed by: ... (c) The following independent boards and commissions which are hereby created: ... School committee." No other entity listed in § 3–100(c) was deleted from the list, but three were added (the Zoning Board, Detention Facility Board, and Planning Board), and the Board of Pensions and Retirement was changed to the Board of Retirement.

**68.** An editor's note appearing in the texts of both the original and the amended charters, at the start of Article VI, which includes section 6–107 and 6–108, indicates that the text of this article does not derive from the 1952 original but from a 1953 corrective amendment to it: "Article VI of the original Home Rule Charter was declared unconstitutional in *State ex rel Messier v. Turrow et al.*, 81 R.I. 149, 99 A.2d 484. Subsequently, the Legislature, in a Special November Session, 1953, enacted chapter 3239 entitled as follows: 'An Act pertaining to municipal primaries and elections in the City of Central Falls, and validating certain provision in the City of Central Falls Home Rule Charter.' *This Act is set out herein, in place of the original Article VI.*" (Emphasis added.) If this note is to be credited (I make no determination on that issue), then (i) the 1952 charter did not include this Article VI, (ii) the 2007 amended charter may not have included it either, and (iii) Article VI

107,[69] though not identical to deleted § 3–608(1), is very similar to it: like the deleted section, it specifies that the school committee shall consist of five members, one from each of the City's five wards, and it further specifies when their terms shall begin and when elections shall be held. Section 6–108 [70] is virtually identical to deleted § 3–608(2). Deleted § 3–608(3) has no remaining parallel or equivalent in the charter as amended. The original charter also included mention of school committee members in §§ 6–109 and 6–110, both of which were carried over unmodified into the amended charter. Section 6–109 specifies when general elections for city officers, expressly "including members of the school committee," shall be held. Section 6–110 deals with signature requirements on petitions for city officers, "including

members of the school committee," to be elected. Also, the amended charter, at ¶ 4–1500, carries over from the original a reference to a school department: "The board of recreation shall ... cooperate with the school department in coordinating its activities with the recreation program conducted by the school department." This appears to be the only mention of a school "department" in the charters, old and new.

20. In 2007, the General Assembly ratified the city charter as amended.

21. The General Assembly has never authorized the Central Falls Board of Trustees or the state administrator to exercise any sovereign power in the areas of taxation, eminent domain, or the police power other than the enforcement of com-

---

may be a legislative fix that the editors reproduced as if it were part of the charter because it was designed to fill a gap left by the invalidation of the original Article VI. This leaves much uncertainty about Article VI.

69. Section 6–107, entitled "Election of members of school committee," states:

The school committee shall consist of five members, one of whom shall be elected from each of the five wards as the same are now constituted. The terms of members of the school committee shall begin on the first Monday of January following the year in which they were elected, except that at the election held on January 19, 1954, a member from the first ward shall be elected to serve from the 1st day of February, 1954 until the first Monday of January, 1956, a member from the second ward and a member from the third ward to serve from the 1st day of February, 1954, until the first Monday of January, 1958, and a member from the fourth ward and a member from the fifth ward to serve from the 1st day of February, 1954, until the first Monday of January, 1960 and until their successors are elected and qualified. A member elected to fill a vacancy shall serve for the balance of the unexpired term. At each municipal election to be held on the first Tuesday after the first Monday in November, 1955 and in

every odd year thereafter, there shall be elected for a term of six years commencing with the first Monday in January then next succeeding a member of the school committee to replace the one whose term shall be expiring.

In the language of the amended charter, this section is modified only by the replacement of "the 1st day of February" each time it occurs with "February 1."

70. Section 6–108, entitled "Vacancies in membership of school committee," stated:

In case of death, resignation, or inability to serve, or removal from the ward from which he was elected, of any member of the school committee, of if for any other cause there shall be a vacancy in the membership of the committee, a majority of the members of the school committee may appoint, as a member of said committee, a person who at the time of his appointment shall be a qualified elector in the ward where such vacancy occurs. Such person shall hold office as a member of the school committee until the first Monday in January, succeeding the municipal election next following his appointment, at which election the unexpired term shall be filled by the electors of the ward so affected.

In the amended charter, the language of this section is identical.

pulsory attendance laws by the Superintendent of Schools.

22. From 1991 to the present, the City has provided services to the School District without invoicing or otherwise charging the School District for said services, including, but not limited to, police programs in the schools, fire department safety programs in the schools, maintenance of school athletic facilities, purchasing of sports equipment, maintenance of school parking lots, trash removal for the schools, fire alarm and sprinkler systems in the schools, and maintenance, repairs, and upgrades to various school buildings. There is evidence that "historically, the City has not budgeted funds specifically for the purpose of maintaining the school buildings."

22.1 Since 1991, the operational costs for the Central Falls public schools have been paid for by the State of Rhode Island. Between fiscal year 1992 and fiscal year 2011, the State provided $604 million for the operation of the School District.[71] Between 2007 and 2011, and aside from any federal funding the City may have received for its schools, the School District has been entirely funded by the State. No other municipal school district in Rhode Island is funded entirely by the state.[72]

23. The Rhode Island Department of Elementary and Secondary Education ("RIDE") completed a full program and finance review of the School District on October 31, 2011 and issued a Final Program Review Determination Letter on November 14, 2011. RIDE anticipates a $256,432 deficit in the School District Unrestricted Fund at the conclusion of fiscal year ending June 30, 2012.

24. In 2010, the General Assembly passed legislation which provided for a new funding formula for public education in Rhode Island (the "Funding Formula").

25. In support of the legislation, Deborah Gist, the Commissioner of the Department of Elementary and Secondary Education, submitted a report to the General Assembly on the Funding Formula, dated November 15, 2010.

26. Under the Funding Formula, commencing Fiscal Year ending June 30, 2013, the City will be required to make contributions to the cost of operating the City's schools by paying funds into the Central Falls Stabilization Fund. There is evidence that the City would be required to fund barely five percent of the School District's total operating costs, while the remaining funding required will continue to come from the State, and that the State has acknowledged that "it is unlikely that the city will be able to fund education in the immediate future" and has begun to explore possible ways it could "allow for 100% funding if the city cannot afford to pay its local contribution."

27. The City's contribution to the Central Falls Stabilization Fund was included in the City's initial Plan of Debt Adjustment filed with the bankruptcy court on September 22, 2011.

28. Under a proposed legislative change to R.I. Gen. Laws § 16–7.2–6, the City's contribution to the Central Falls Stabilization Fund would be increased. There is evidence that the City would be required to fund barely five percent of the School District's total operating costs, while the remaining funding required will continue to come from the State, and that the State has acknowledged that "it is unlikely that the city will be able to fund education in the immediate future" and has begun to explore possible ways it could

---

**71.** Teachers' Union's Statement of Uncontested Facts, ¶¶ 16–17.

**72.** Teachers' Union's Statement of Uncontested Facts, ¶ 18.

"allow for 100% funding if the city cannot afford to pay its local contribution."

29. The Funding Formula funds state-run schools, such as charter public schools, the William M. Davies, Jr. Career and Technical High School, and the Metropolitan Regional Career and Technical Center, differently from its funding of local school districts.

30. Given changes in the school Funding Formula based, in part, on declining enrollments, RIDE forecasts a decline in the School District's state revenue, unrestricted state aid, of $1,688,271 each year for eight years starting in fiscal year ending 2014. The cumulative impact of this decrease over the five-year period from fiscal year ending 2012 to fiscal year ending 2016 is $4,783,465. There is evidence that the State has acknowledged that "it is unlikely that the city will be able to fund education in the immediate future" and has begun to explore possible ways it could "allow for 100% funding if the city cannot afford to pay its local contribution."

31. In addition, the School District received over $10 million in federal grant fund revenues from the 2009 American Recovery and Reinvestment Act ("ARRA"). These monies, used to support school programming and other initiatives, will not be replaced once spent: $4.3 million in ending fiscal year 2012, $2.9 million in fiscal year ending 2013, $.9 million in fiscal year ending 2014, $.1 million in fiscal year ending 2015, and no funds in fiscal year ending 2016. The cumulative impact

of this decrease over the five-year period from fiscal year ending 2012 to fiscal year ending 2016 is $4,324,259.

32. Additionally, RIDE estimates that the School District will face slight declines in non-ARRA federal grant fund revenues over the five-year period. The cumulative impact of this decrease over the five-year period from fiscal year ending 2012 to fiscal year ending 2016 is $555,122.

33. At the time the City filed its initial Plan of Debt Adjustment, the School District's operating costs were fully funded by the State, and the financial information available at the time indicated that the School District had a funding surplus for Fiscal Year ending June 30, 2012.

34. Based upon the RIDE forecasts, the School District is facing a significant drop in revenue sources of approximately $8.5 million over the five-year period. Given the starting deficit at the end of fiscal year ending 2012 and increasing cost trends, without significant cuts to expenses, the School District will have a cumulative deficit well in excess of $10 million by the end of fiscal year ending 2016.[73]

35. As a result of the RIDE Program Review and RIDE revenue forecasts, the City needs to develop an amended Plan of Debt Adjustment to fund the Fiscal Year ending 2012 deficit as well as the projected deficits for the remaining years of the five-year term of the Plan of Debt Adjustment.[74]

73. The School District admits the first sentence of this paragraph but, without citing controverting evidence, denies the second "because it is impossible to know with certainty what the School District's costs and revenues will be during that time frame." I deem the second sentence uncontroverted subject to the unremarkable caveat that it is impossible to know the future and that budgetary projections are projections, not statements of fact about the future.

74. The Teachers' Union denies this fact only on the basis that "it is the State, not the City, which funds the School District and negotiates collective bargaining agreements with the Unions. Accordingly, an adjustment of the School District's finances would have no impact on the City's finances." I therefore

36. The most recent collective bargaining agreement between the School District and the Teachers' Union expired on August 31, 2011.

37. Negotiations on a new collective bargaining agreement were conducted between negotiating teams from the School District and the Teachers' Union prior to the filing of the bankruptcy petition. These negotiations did not yield a new collective bargaining agreement.

38. Soon after the commencement of the bankruptcy case, the Receiver replaced the negotiating team that had been acting on behalf of the School District and continued negotiating a collective bargaining agreement between the City and the Teachers' Union. The Teachers' Union reserved its right to argue that the School District is not subject to the City's bankruptcy proceeding and that the Receiver is without authority to execute a collective bargaining agreement.

39. On July 29, 2011, the Receiver issued an order to the School District directing that the Board of Trustees not to enter into or to amend any collective bargaining agreements or to approve expenditures or contracts in excess of $25,000 without the Receiver's prior written approval.

40. The City and Council 94 have a collective bargaining agreement which expires on June 30, 2013.

41. The City and Council 94 began discussions to open up and amend their collective bargaining agreement in December 2011.

42. R.I. Gen. Laws § 16-1-11 states: [75]

For the purposes of this section and §§ 16-1-10 and 16-5-22, the department of elementary and secondary education shall be subrogated to all the powers and functions of the city or town school committee, including the right to draw orders upon the city or town treasurer for the payment for the support of the public schools of the city or town of any money in the city or town treasury required by law to be accredited to the public school account. The department of elementary and secondary education may also apportion to or expend for the support of the public schools of the city or town any part of the annual appropriation for public schools provided by § 16-4-5 as shall not be apportioned for other purposes, or the whole, or any part of the annual appropriation as the general assembly shall make for the purposes of this section and §§ 16-1-10 and 16-5-22.

accept ¶ 35 subject to the caveat that any deficit in the School District's budget does not affect the City's budget if the School District is not part of the City.

75. Citing to the two statutory provisions reproduced in this paragraph, the City states that it is established and uncontroverted that "the City will be liable for any difference between any appropriation by the state government or the federal government and the costs arising from any collective bargaining agreement commencing in Fiscal Year ending 2012." The Teachers' Union denies this, states that § 16-1-11 and § 16-7.2-6(d) speak for themselves, and, on the basis of a RIDE 2010 Report (Teachers Exhibit 29, at pp. 8-9), states (i) that the State continues to fully fund the School District and (ii) that the State has acknowledged that "it is unlikely that the City will be able to fund education in the immediate future" and has begun to explore possible ways it could "allow for 100% funding if the city cannot afford to pay its local contribution." Because the City's "fact" is not a fact but a conclusion of law based on the cited statutes, it suffices to reproduce the statutory language in question. The Court further notes that the Union's evidence that the State may find a way to avert a shortfall does not controvert the proposition that the City will be liable for any shortfall that the State does not avert.

And R.I. Gen. Laws § 16–7.2–6(d) states:

Central Falls Stabilization Fund is established to assure that appropriate funding is available to support the community, including students from the community that attend the charter schools, Davies, and the Met Center pursuant to § 16–7.2–5, due to concerns regarding the city's capacity to meet the local share of education costs. This fund requires that the difference between education aid calculated pursuant to § 16–7.2–3 and education aid, as of the effective date of the formula, shall be shared between the state and the city of Central Falls. The state's share of the fund will be paid directly to the Central Falls school district upon verification that the city has transferred its share of the local contribution for education. At the end of the transition period defined in § 16–7.2–7, the municipality will continue its contribution pursuant to § 16–7–24.

43. Based upon preliminary financial model projections prepared by the City, and in particular the sharp decrease in projected revenues from state and federal sources over the term of the City's five-year plan of debt adjustment, without substantial changes to the structure and delivery of educational services within the School District, the City will not be able to propose a plan with balanced budgets in the absence of a substantial infusion of state or federal funds.[76]

44. The Rhode Island State Fiscal Year 2012 Supplemental Appropriations Act, Article 1, has a separate line item for the School District. No other school district in Rhode Island has a similar line item entry in this document. The only other schools to have such separate State budget allocations are State schools such as Rhode Island School for the Deaf and Davies Vocational.[77]

45. Rhode Island Education Aid, an October 2010 report of the Rhode Island House Fiscal Advisory Staff, shows State aid to Central Falls as a separate budgetary line item.[78]

46. The Fiscal Year 2010, 2009, and 2008 Personnel Supplements for the State Department for Elementary and Secondary Education show State aid to the School District as a separate budget line item. No other school district has a similar line item entity in these documents.[79]

47. Except insofar as (i) the School District is part of the City (which is a question of law to be decided in this case) and (ii) members of the Board of Trustees are residents of Central Falls, the School District establishes its annual budget with no City involvement.

48. Under § 16–2–34, the Superintendent must "prepare a budget and otherwise participate in budget development as

**76.** The facts in this paragraph are established by averments in the affidavit of Gayle Corrigan. The Teachers' Union denies this paragraph and cites as controverting evidence only the RIDE 2010 Report (Teachers Exhibit 29, at pp. 8–9), which, the Union says, stands for the proposition "that the State continues to fully fund the School District and has begun to explore possible ways it could 'allow for 100% funding if the city cannot afford to pay its local contribution.'" This evidence does not controvert the City's fact in evidence because that evidence already states that the City "will not be able to propose a plan with balanced budgets *in the absence of a substantial infusion of state or federal funds.*"

**77.** Teachers' Union's Statement of Uncontested Facts, ¶ 19.

**78.** Teachers' Union's Statement of Uncontested Facts, ¶ 20.

**79.** Teachers' Union's Statement of Uncontested Facts, ¶ 21.

required," R.I. Gen. Laws § 16–2–34(h)(6), and the Board of Regents provides "parameters for overall budget requests, approve[s] the budget, and otherwise participate[s] in budget development," and the Commissioner recommends "parameters for overall budget requests, recommend[s] a budget, and otherwise participate[s] in budget development," R.I. Gen. Laws § 16–2–34(c), (d).[80]

49. The historic practice has been for the superintendent to prepare the budget. Except insofar as the School District is a part of the City, in which case the superintendent would be a City official, no City official has had responsibility for preparing or approving the School District's budget since 2005.[81]

50. The City and the School District issue separate annual financial statements. In each year starting with the year ending June 30, 2003, the financial statements prepared for the City were prepared by different auditors than the financial statements prepared for the School District.[82]

51. In each year starting with the year ended June 30, 2002, Note 1 to the City's financial statements state:

Reporting Entity: In evaluating how to define the City, for financial reporting purposes, management [i.e., the City] has considered all potential component units. The decision to include a potential component unit in the reporting entity was made by applying the criteria set forth in GASB Statement No. 14. Under GASB Statement No. 14, the financial reporting entity includes both the primary government and all of its component units. Component units are legally separate entities that meet any of the following three tests:

Test 1—The primary government appoints the voting majority of the board of the potential component unit and

• Is able to impose its will on the potential component unit and/or

• Is in a relationship of financial benefit or burden with the potential component unit;

Test 2—The potential component unit is fiscally dependent upon the primary government; or

Test 3—The financial statements would be misleading if data from the potential component unit were not included.

The following entities were considered for classification as a component unit for fiscal year 2003:

• Central Falls Redevelopment Agency

Although this entity meets certain criteria of the tests previously listed, it is deemed not to have separate legal status apart for the City. As a result, the financial data of the above entity has been included as a non-major special revenue fund within the City's financial statements.

• Central Falls Housing Authority
• Central Falls Community Center
• Central Falls School District
• Central Falls Detention Facility Corporation

Since these entities do not meet any of the above three tests, they have

---

**80.** Teachers' Union's Statement of Uncontested Facts, ¶ 23.

**81.** Teachers' Union's Statement of Uncontested Facts, ¶ 24. The term "historic practice" here is undefined. And the significance (if any) of 2005 is not evident from the deposition testimony submitted in support of this paragraph.

**82.** Teachers' Union's Statement of Uncontested Facts, ¶ 25.

not been included in the financial reporting entity.[83]

52. The covers of the eight annual financial statements for the School District for the years ended June 30, 2003 through June 30, 2010, describe the School District as "a component unit of the State of Rhode Island." [84]

53. The School District has its own bank accounts that are maintained for the benefit of the School District. It is the responsibility of the Superintendent to maintain those accounts; the Superintendent has authority over those accounts and uses them for "school related purposes." Except insofar as the School District may be deemed a unit of the City (a contested issue of law which it is the purpose of this adversary proceeding to decide), and therefore the Superintendent a City official, no City official has authority over those accounts.[85]

54. School District employees currently receive paychecks issued by the School District payroll department.[86] Before the 1991 State takeover, payroll checks for School District employees were issued by the "City of Central Falls." After the takeover, those checks were issued by the "Central Falls School District." [87]

55. To obtain insurance, the School District participates in "a non-profit, public entity risk pool (Rhode Island Inter–Local Risk Management Trust, Inc.), which provides coverage for property/liability claims and workers compensation claims." The City, too, participates in the risk pool, but it signed a participation agreement with the risk pool separate and apart from the participation agreement the School District executed with the risk pool. The School District pays its own premiums to the risk pool for coverage, separate from any premiums paid by the City for coverage for the City.[88]

56. The Superintendent answers to the Board of Trustees, and the Board of Trustees answers to the Board of Regents and the Commissioner. The School District has its own Finance Department, HR Department, Building and Maintenance Department, and IT system separate from the City.[89]

57. The School District maintains its own business records, which the Superintendent is responsible for maintaining.[90]

58. The School District enters into ordinary course commercial contracts in its own name, including on at least one occasion with the City itself (through the Receiver).[91]

---

83. Teachers' Union's Statement of Uncontested Facts, ¶ 26.

84. Teachers' Union's Statement of Uncontested Facts, ¶ 27.

85. Teachers' Union's Statement of Uncontested Facts, ¶ 28.

86. Teachers' Union's Statement of Uncontested Facts, ¶ 29.

87. Teachers' Union's Statement of Uncontested Facts, ¶ 30.

88. Teachers' Union's Statement of Uncontested Facts, ¶¶ 31–33.

89. Teachers' Union's Statement of Uncontested Facts, ¶ 34.

90. Teachers' Union's Statement of Uncontested Facts, ¶ 35. The Teachers' Union also contends that it is established and uncontroverted that "the School District can sue and be sued in its own name," but the Receiver disputes this, saying that although the School District has sued and been sued in its own name, the General Assembly has not granted this power under R.I. Gen. Laws §§ 16–2–9 and 16–2–34. The court concludes that this "fact" is a conclusion of law.

91. Teachers' Union's Statement of Uncontested Facts, ¶ 36.

59. With the exception of contracts for buildings and maintenance, since 2005, there have been no City officials (other than the Superintendent, if the School District is part of the City) whose job it is to approve ordinary course goods and services contracts entered into by the School District.[92]

60. Section 16-2-34 provides that the superintendent, along with the chair of the Board of Trustees, must "negotiate . . . all district employment contracts, which contract shall be subject to the approval of the commissioner of elementary and secondary education with the concurrence of the board of regents." R.I. Gen. Laws § 16-2-34(h)(10).[93]

61. The Chair of the Board of Trustees and the Superintendent, along with additional designees, have negotiated collective bargaining agreements on behalf of the School District. Since the advent of the Board of Trustees in 2002, all School District contracts with the Teachers' Union have been approved by the Board of Trustees with the concurrence of the Commissioner and Board of Regents. The Superintendent and the Chair of the Board of Trustees submitted the most recent collective bargaining agreement between the Teachers' Union and the School District to the Commissioner and the Board of Regents for their approval. The Commissioner approved the agreement and the Board of Regents concurred with the Commissioner's approval.[94]

62. Since 1992, no City official (except for the Superintendent and the Board of Trustees to the extent they are deemed City officials) has participated in negotiations between the School District and its unions.[95]

63. The School District enters into collective bargaining agreements its own name and has done so since 1992.[96]

64. The School District has its own formal personnel policies, set by the Superintendent in consultation with and subject to the approval of the Board of Trustees. Except to the extent that the School District is part of the City and the Superintendent is therefore a City official, no City official has any role in setting these policies.[97]

65. The Superintendent is ultimately responsible for hiring and firing employees (except that there is a question of law as to whether terminated employees have a right of appeal to the Board of Trustees).[98]

66. Elected City officials have had no input on employment decisions that were made by Superintendent Gallo or any other superintendent from 2005 to the present.[99]

67. The pay of most School District employees is set by their collective bargaining agreements, which are negotiated by the Superintendent and subject to the approval of the Commissioner of Education and the Board of Regents. R.I. Gen. Laws § 16-2-34(h)(10). Except to

92. Teachers' Union's Statement of Uncontested Facts, ¶ 37.

93. Teachers' Union's Statement of Uncontested Facts, ¶ 38.

94. Teachers' Union's Statement of Uncontested Facts, ¶¶ 39–40.

95. Teachers' Union's Statement of Uncontested Facts, ¶ 41.

96. Teachers' Union's Statement of Uncontested Facts, ¶ 42.

97. Teachers' Union's Statement of Uncontested Facts, ¶ 43.

98. Teachers' Union's Statement of Uncontested Facts, ¶ 44.

99. Teachers' Union's Statement of Uncontested Facts, ¶ 45.

the extent that the School District is part of the City and the Superintendent is therefore a City official, no City official is responsible for deciding how much any employee of the School District gets paid.[100]

## Count I: Whether the School District Is Part of the City

### a. Arguments of the Parties

The parties' arguments are numerous and extensive. I summarize here only their overall structure.

The Receiver's position is as follows. Rhode Island law governs the question of whether the School District is part of the City. Case law in Rhode Island recognizes that education is in the first instance a state-level concern, but one that the General Assembly has delegated to or vested in the school committees of the various municipalities. The Central Falls home rule charter of 1952 created a school committee and gave to it the basic governance of the City's schools, collectively known as the School District. The School District is not a separate entity from the City: it lacks incidents of municipal sovereignty, such as police powers and powers of taxation and eminent domain; it cannot hold property in its own name; though it may contract in its own name, the City is liable for its contracts; it cannot be sued in its own name; and prior to 1991, it was controlled by the City's school committee.

The 1991 and 2002 Acts did not change the School District's status as a department of the City. The plain language of those acts confirms that the City remained the fiscal agent for the School District,

that governing case law was not abrogated, that the City remained liable for debt service on school bonds, and that the City continued to own and maintain the school buildings and adjacent property. More importantly, the Acts cannot have divested the City of the School District because that would have altered the City's form of government, which, by the State constitution, would have required passage by the City's electorate. Though the City has no active school committee, the City Charter, amended in 2007, continues to provide for the election of a school committee.

Nor does the extent of the School District's reliance on State funding change its status. Many municipalities receive State funding to aid the operation of their schools. Central Falls differs only in degree and has continued to fund the schools, albeit minimally. And the State, by recent legislation, is requiring the City to fund a larger portion of the School District's budget in coming years.[101]

The Teachers' Union responds in the first instance with arguments under federal law. The School District is not a debtor in this Chapter 9 case. It is a separate and distinct governmental entity. Under federal law, the School District must be treated as a separate entity for Chapter 9 purposes and is not authorized to be a debtor in its own right. The exercise of bankruptcy jurisdiction over it would violate the Tenth Amendment.

In the alternative, the Teachers' Union argues that, under Rhode Island law, the School District is not part of the City. Before 1991, it fit the paradigm of a mu-

---

100. Teachers' Union's Statement of Uncontested Facts, ¶ 46.

101. Anticipating that the Teachers' Union would make an "arm of the state" argument, the Receiver also made extensive arguments on that subject. The Teachers' Union did not

in fact make the anticipated argument, and therefore I need not set forth the Receiver's position on it. I agree with the Receiver and the Teachers' Union that the arm of the state theory is irrelevant.

nicipally-run school district. That changed with the 1991 and 2002 Acts, which together removed the schools from City control. These changes were sealed by amendments to the City's charter in 2007, which terminated the City's school committee. The State's control and funding of the School District is not just extensive, but complete and unique in the State. It must be seen as a difference in kind. Any argument that these changes are "only temporary" ignores their 21–year duration and modifications to the City charter. And the cases on which the Receiver relies are inapposite: they are limited to circumstances where the school district is funded by the municipality and controlled by its school committee, neither of which is true in Central Falls. The State has the power to create a school district that is independent of a municipality and, by virtue of the 1991 and 2002 Acts and the amendment to the City charter, has done so here.

In its reply brief and at oral argument, the Receiver added a further argument, this one under federal law: that under the definition of municipality in the Bankruptcy Code, the School District would not qualify as a municipality in its own right, and therefore it should not now be viewed as a separate entity.

### b. Overview of Analysis

The debtor in this chapter 9 case is the City of Central Falls, and the question presented by Count One is simply whether, under Rhode Island law, the School District is part of the City.[102] Under Rhode Island law, the crucial factors are not the extent of state funding or the duration of state intervention. Rhode Island law begins with the act by which the School District was created, the adoption of the

City Charter of 1952. The Charter created a municipally-elected school committee to govern the City's schools, collectively known as the School District. Until 1991, the School District fit the paradigm of a municipally-run school district, one which, under Rhode Island case law, would have been viewed and treated as part of the City. The 1991 and 2002 Acts transferred political control over the School District from the City, through its school committee, to a state administrator and then to the state-appointed Board of Trustees. It may well be, as the Receiver argues, that these Acts cannot by themselves have removed the School District from the City. The Receiver contends that under the Rhode Island constitution, removal would have required an amendment to the City's Charter, itself requiring a vote of the City's electors. In 2007, however, the City did, by the vote of its electors approving amendments to the City's charter and the State legislature's ratification, disestablish its school committee and with it any remaining political control over and constitutional connection to the School District. The City's remaining obligations to and interests in the School District—that the District serves the City's children, uses the City's school properties, requires City funding, is governed in part by trustees who are City residents—do not make it part of the City. However provisional this arrangement may be, the status quo is separation.

### c. Governing Law

For jurisdictional purposes, the Teachers' Union insisted that the issues presented in this proceeding were exclusively of state law, yet it now leads with three arguments under federal law: (i) the

---

**102.** If not, the court need not determine what else the School District might be: a stand-alone entity, an agency of the State, or something else. That issue is not presented here or within this court's jurisdiction to decide.

School District is not eligible to be a debtor under Chapter 9, both because it has not been authorized by the State to file a bankruptcy petition and because the Receiver himself has not been authorized by the State to file a Chapter 9 petition on its behalf; (ii) exercise of bankruptcy jurisdiction over the School District would violate the Tenth Amendment to the U.S. Constitution; and (iii) the School District would qualify as a municipality under the Bankruptcy Code and therefore, even if under state law it is part of the City, it must be treated as a separate and distinct entity for purposes of Chapter 9. The Receiver responds that the first and second arguments are moot and irrelevant but answers the third at some length, arguing that the School District is not a municipality within the meaning of § 101(40) of the Bankruptcy Code and therefore should not be deemed a separate entity from the City. These arguments require that the court determine their relevance and whether the question presented by Count One is, at bottom, one of federal law or state.

■ Only a "municipality," as that term is defined in the Bankruptcy Code, may be a debtor under Chapter 9 of the Bankruptcy Code.[103] The debtor in this case is the City of Central Falls—and only the City of Central Falls. The City is undisputedly a municipality, and its eligibility to be a debtor has already been determined, as reflected by entry of an order for relief.[104] As the Receiver points out, he has not sought, and does not in this proceeding seek, Chapter 9 relief for the School District. Accordingly, I conclude that the Teachers' Union's arguments

about eligibility—that, for lack of State authorization, the School District is not eligible to be a debtor under Chapter 9, and that the Receiver is not authorized to file a Chapter 9 petition on its behalf—are moot and irrelevant.

■ In Count One, the Receiver seeks only a determination that the School District is part of the City. A judgment in his favor on this count would not add a debtor to this case but merely define the scope of the existing debtor. That debtor, the City, has voluntarily petitioned the court for bankruptcy relief and has done so with proper state authorization; the Teachers' Union does not contend otherwise. Consequently, the resulting exercise of bankruptcy jurisdiction over the City, whether it includes the School District or not, would not offend the Tenth Amendment. The Teachers' Union appears to concede this, too, because it argues that the offense against the Tenth Amendment would occur if (i) the court exercised jurisdiction over the School District (ii) notwithstanding that it is a *separate* entity from the City. But this cannot occur. If the School District is deemed a separate entity, there will be no exercise of jurisdiction over it, either as part of the debtor or as a separate debtor. The Tenth Amendment argument is therefore moot, of no consequence.

■ This leaves only the Teachers' Union's third argument: that the School District would qualify as a municipality under the Bankruptcy Code and therefore, even if under state law it is part of the City, it must be treated as a separate and distinct entity for purposes of Chapter 9. In restated form, the Union is arguing that

**103.** 11 U.S.C. § 109(c)(1) ("an entity may be a debtor under chapter 9 of this title if and only if such entity—(1) is a municipality"); 11 U.S.C. § 101(40) (in title 11, " 'municipality' means political subdivision or public agency or instrumentality of a state").

**104.** The court established a deadline for filing objections to the eligibility of the City to be a debtor and for filing motions to dismiss. All filed objections to eligibility were withdrawn, whereupon the court entered an order for relief. See 11 U.S.C. § 921(c) and (d).

even if, under Rhode Island law, the School District is a part of the debtor City, the Bankruptcy Code requires that it be treated otherwise. The court need not address this issue unless it first determines that, under state law, the School District is part of the City; otherwise, it is moot. Even if the court were to determine that the School District is part of the City, the issue would be collateral to the declaratory counts that are the subject of the Receiver's complaint. In substance this argument is a motion to dismiss the bankruptcy case as to a portion of the debtor. Such a motion must be filed in the bankruptcy case itself, with notice to all creditors. It is not properly brought in this adversary proceeding, much less (in the first instance) by argument in response to a motion for summary judgment, and is in fact untimely.

■■■ In the interest of completeness, however, I address the merits here. The Union rests this argument on five cases in which a school district, utility district, water district, or housing authority has been deemed a municipality that is eligible to be chapter 9 debtor in its own right, separate from the municipality in which it is located. I need not parse the cases in any depth; at best, they stand for the proposition that a school district may, in some instances, be a municipality and an eligible Chapter 9 debtor.

This is very different from saying that Chapter 9 authorizes a bankruptcy court to exclude from bankruptcy relief a school district or other portion of an eligible debtor municipality, notwithstanding that the school district is, under the law of the state of which it is a creature, part of the debtor municipality. I am aware of no authority for that practice and find none in Chapter 9. "[A]n entity may be a debtor under chapter 9 ... if ... such entity is a municipality." [105] A municipality, if it is eligible at all, is eligible as it exists in state law. The Bankruptcy Code neither creates nor redefines it and makes no provision for limiting eligibility to portions of otherwise eligible municipalities. This proposal has no parallel in other chapters of the Code. What the Teacher's Union is proposing finds no basis in the Bankruptcy Code.

In addition, it would be antithetical to the principles of the Bankruptcy Code, which is informed by an intent to bring all of a debtor's debts and contracts into the case, in order to provide the most comprehensive relief possible.[106] Were the court to exclude from a municipality's bankruptcy case significant financial obligations of the debtor, the utility of its bankruptcy relief would be severely compromised. For all these reasons, the court rejects this argument.

■■■ This leaves only Count One as framed by the Receiver. It asks not whether the School District is a municipality but whether it is part of the City of Central Falls. As the City is a creature of Rhode Island law, so must the answer to this question be.[107] This matter is therefore governed by Rhode Island law.

105. 11 U.S.C. § 109(c)(1).

106. See, *e.g.*, 11 U.S.C. § 101(5) (definition of claim).

107. See *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). *Butner* involved property rights, not the relation of a municipality to its school district, but the principle is the same: unless Congress has altered the governing considerations, a question of state

When ruling on an issue of state law, a federal court exercising bankruptcy jurisdiction, like a federal court sitting in diversity, must rule as it believes the highest court of the state would rule.[108] To that end, the federal court should employ the method and approach announced by the state's highest court.[109] Where the issue is one of statutory construction, the court should follow the state's rules of statutory construction.[110]

### d. The City Charter of 1952

Municipalities are creatures of state law and subject to the power of the State, as limited by its constitution, to create, divide, and even abolish them.[111] The issue of whether the School District is part of the City turns on how the City and its relation to the School District are defined and constituted by state law.

In this instance, the originating act—that is, the act by which the School District was formed—is the adoption by the City and ratification by the State of the City's home-rule charter of 1952. The parties have cited to the court no other act of the State by which the School District was established,[112] and I am aware of no other. The City of Central Falls is a duly authorized municipal corporation that has a home-rule charter adopted in accordance with Article 13 of the Rhode Island Constitution.[113] The City's charter, first adopted in 1952 and amended in 2007, in large measure defines the form and constitution of the City as a body politic.

In relevant part, § 3–100 of the 1952 charter specified the authorities through which the executive and administrative work of the City would be performed and also *created* certain of those authorities, including a school committee. It stated: "The executive and administrative work of the city shall be performed by: ... (c) The following independent boards and commissions *which are hereby created:* ... School committee." [114] By this act the Central Falls School District was constituted as a part of the City of Central Falls. The nomenclature "school district" appears to be simply the term by which the State refers to the collection of elementary and secondary schools that are operated by the school committee of a particular city or town. The charter essentially creates the school district as a department of the City, under the control of the City's elected school committee, one of the City's independent boards.[115]

law should be determined in the usual manner, unaffected by the bankruptcy context in which the question arises.

**108.** *In re Miller,* 113 B.R. 98, 101 (Bankr. D.Mass.1990).

**109.** *Cahoon v. Shelton,* 647 F.3d 18, 22 (1st Cir.2011).

**110.** *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 263 (1st Cir.1994); *Huguenin v. Ponte,* 29 F.Supp.2d 57, 63 (D.R.I., 1998).

**111.** *Kennedy v. Mayor of Pawtucket,* 24 R.I. 461, 53 A. 317, 320 (1902), citing *Laramie Co. v. Albany Co.,* 92 U.S. 307, 310, 23 L.Ed. 552 (1875) ("Corporations of the kind are properly denominated public corporations, for the reason that they are but parts of the machinery employed in carrying on the affairs of the State; and it is well-settled law, that the charters under which such corporations are created may be changed, modified, or repealed, as the exigencies of the public service or the public welfare may demand.").

**112.** I set aside for the time being any later changes or reconstitutions, including those effected by the 1991 and 2002 Acts and the 2007 changes to the city charter.

**113.** *Moreau v. Flanders,* 15 A.3d at 569.

**114.** 1952 Charter of the City of Central Falls, § 3–100(c) (emphasis added).

**115.** In other sections of Article III of the Charter, entitled "Executive and Administrative Branch–Organization," the 1952 charter

The Receiver has succinctly and accurately summarized Rhode Island law on the relation of a school committee to its municipality on the one hand and the State on the other. The Rhode Island Constitution grants the General Assembly plenary power over education.[116] The General Assembly has exercised this power generally by statutorily vesting power over education in local school committees:

> The entire care, control, and management of all public school interests of the several cities and towns shall be vested in the school committees of the several cities and towns.[117]

On the basis of this delegation, the Rhode Island Supreme Court has held, in *Cummings v. Godin* and repeatedly thereafter, that school committees are "agencies of the state" in that they carry out by delegation the educational mission that resides in the first instance in the General Assembly; but in the same cases the court has further held that school committees "are not 'state agencies' because their duties are limited to matters of local rather than statewide concern."[118] It follows, *Cummings* concluded, that "a school committee is a municipal body and all of its employees, city employees."[119] Accordingly, in *Cummings*, the court held that an employee of the Woonsocket public schools was an employee of the City of Woonsocket and subject to a provision in the Woonsocket city charter applicable to city employees.[120] And in *Peters v. Jim Walter Door Sales of Tampa, Inc.*, the court ruled that the City of East Providence, and not the East Providence School Committee, was the proper party defendant in a suit for the death of a student from injuries he incurred in school.[121]

In view of (i) the creation of the Central Falls school committee by the 1952 city charter, (ii) the General Assembly's delegation of authority over education to the various school committees, and (iii) the

specified how many members the committee would have and when their terms would commence, § 3–608(1), the manner of filling of vacancies on the school committee, § 3–608(2), and the qualifications of school committee members. § 3–608(3). And in Article VI, entitled "Municipal Elections," the 1952 charter contained two further sections, §§ 6–107 and 6–108, that dealt exclusively with school committee members and that were essentially duplicative §§ 3–608(1) and 3–608(2). See Facts ¶ 19 above.

**116.** *City of Pawtucket v. Sundlun*, 662 A.2d 40, 56–57 (R.I.1995) (citing R.I. Const. art. XII, § 1); see also *Nat'l Educ. Ass'n of R.I. v. Garrahy*, 598 F.Supp. 1374, 1387 (D.R.I.1984) ("it is beyond gainsaying that under [Rhode Island] state law, the state exercises supreme responsibility in the arena of education").

**117.** R.I. Gen. Laws § 16–2–9(a); see also *East Providence School Committee v. Smith*, 896 A.2d 49, 53 n. 4 ("the General Assembly has delegated its constitutional responsibilities for public education to [school committees]"). General Laws 1938, ch. 178, § 22

was a precursor to G.L1956 § 16–2–9, which, like the current version of the statute, vested school committees with "the entire care, control, and management" of schools. *East Providence School Committee v. Smith*, 896 A.2d at 53 n. 3.

**118.** *Cummings v. Godin*, 119 R.I. 325, 377 A.2d 1071, 1073 (1977); *Coventry School Committee v. Richtarik*, 122 R.I. 707, 411 A.2d 912, 915 (1980); *Peters v. Jim Walter Door Sales of Tampa, Inc.*, 525 A.2d 46, 47 (R.I. 1987); *East Providence School Committee v. Smith*, 896 A.2d 49, 53 (R.I.2006); accord *Casey v. Newport School Committee*, 13 F.Supp.2d 242 (D.R.I.1998) (applying Rhode Island law and holding city, rather than school committee, was proper defendant).

**119.** *Cummings v. Godin*, 377 A.2d at 1074; *Peters v. Jim Walter Door Sales of Tampa, Inc.*, 525 A.2d at 47.

**120.** *Id.*

**121.** *Peters v. Jim Walter Door Sales of Tampa, Inc.*, 525 A.2d at 47.

Rhode Island Supreme Court's holding that a school committee, notwithstanding its role as an agency of the state, is a department of its municipality, I am satisfied that, at least until 1991 and the changes that ensued, the School District was part of the City.[122]

### e. The 1991 and 2002 Acts and the Charter Amendment

Have subsequent events changed this essentially constitutional relationship of the City to its school district? The Receiver argues that notwithstanding the 1991 and 2002 Acts, which removed control of the School District from the Central Falls School Committee and placed it first in a state administrator and then in the state-appointed Board of Trustees that continues to govern the School District, the essential relation of the City to the School District remains unaffected. It must remain unaffected, the Receiver argues, because the 1991 and 2002 Acts were both unilateral acts of the General Assembly, but a permanent modification of the City's form of government would have required an amendment to its charter, and, by constitutional requirement, R.I. Const. Art. 13, § 8 (procedure for amendments to charters), that in turn would have required a vote of the City's electorate.[123] Neither Act was voted on by the City's electorate. The Receiver further contends that the amendments to the City's charter in 2007 essentially changed nothing and preserved provisions for election of a school commit-

tee. Accordingly, despite the City's long-standing lack of political control over the School District, the School District's inclusion in the City is unchanged. The arrangements effected by the 1991 and 2002 Acts must be viewed as temporary and provisional. The Acts effected no permanent change in the form, structure, or reach of City government. So argues the Receiver.

The Teachers' Union disagrees. I need not set forth its arguments in full. It suffices to note the Union's position on the 2007 amendment to the city charter, which is that the amendment terminated the City's school committee altogether.

■ The court agrees. The critical amendment was the deletion of the words "school committee" from § 3–100(c) of the City's charter.[124] By virtue of those words, § 3–100 had created a school committee and had indicated that the City's executive and administrative work would be performed in part through that committee. The deletion disestablished the school committee and left no board or agency through which the City might control the schools. Insofar as the State's grant of "the care, control, and management" of the schools in R.I. Gen. Laws § 16–2–9(a) is a grant specifically to *the school committees* of the several cities and towns," that amendment effectively severed the City's constitutional connection to the School District. That action was undertaken in full compliance with the legal procedures that

---

**122.** The Teachers' Union appears to agree. "Over twenty years ago, the Central Falls School District fit into the paradigm of a municipally controlled school system that, through its School Committee, administered the State function of education within the borders of its home municipality." Teachers' Unions Amended Memorandum, p. 37.

**123.** *Viveiros v. Town of Middletown,* 973 A.2d 607, 614 (R.I.2009) ("once a town or city has

adopted a charter pursuant to the home rule provisions of article 13 of the Rhode Island Constitution, the charter can be modified only by amendment pursuant to section 8").

**124.** It is undisputed that the amendment was passed by the electorate and ratified by the General Assembly, and satisfies the procedural requirement in R.I. Const. Art. 13, § 8 for amendment of the charter.

Rhode Island has established for self-governance. The electorate voted for the change and the state legislature ratified it. It can no longer be said that the structure of the City's government includes the care, control, and management of the schools, which is precisely the business of the School District.

It is true, as the Receiver points out, that the charter appears to have retained provisions for election of a school committee, §§ 6–107 and 6–108. It is also true that the deletion of §§ 3–608(1) and 3–608(2) is, in itself, inconsequential, those sections having been essentially duplicative of retained sections 6–107 and 6–108. Likewise, the deletion of § 3–608(3) is in itself of no real relevance, as it only removed certain limitations on school committee membership. Still, it is undisputed (i) that the school committee itself was deleted from the list in § 3–100 of the independent boards and commissions by which the City's executive and administrative work would be performed and (ii) that Chapter 14 of Article IV, which had set forth the powers and duties of the school committee, was also deleted. The deletions of §§ 3–608(1), 3–608(2), and 3–608(3) are consistent with and confirmatory of the deletion of school committee in § 3–100. The deletion of the school committee from § 3–100 must be given effect no less than the inclusion of "school committee" in § 3–100(c) was given effect before the deletion.[125] The purpose of the surviving provisions for electing school committee members is unclear, and, aside from the "editor's note" appearing in the volumes setting forth the texts of the original and amended charters, the parties have offered no legislative history on the subject.[126] Whatever their purpose, however, there is nothing ambiguous about the deletion in § 3–100. There remains no charter-authorized school committee to which members might be elected.[127]

In view of this change to the charter and the resulting disestablishment of the Central Falls school committee, it is unnecessary to determine whether the 1991 Act or the 2002 Act effectively removed the School District from the City. The deed has in any event been done by other, more fundamental, means.

As it stands, the Central Falls School District has been assigned by the 2002 Act and R.I. Gen. Laws § 16–2–34 to the control of the state-appointed Board of Trustees. The Board has been given "the powers and duties of a school committee." The Board is independent of the City and not mentioned in the City's charter. Its members are not elected by City voters, appointed by City officials, or answerable

---

125. *Retirement Bd. of Employees' Retirement System of State v. DiPrete*, 845 A.2d 270, 297 (R.I.2004) ("We shall not interpret a statute to include a matter omitted unless the clear purpose of the legislation would fail without the implication.").

126. From the editor's note, it appears that Article VI of the charter, including §§ 6–107 and 6–108, may not in fact be part of the amended charter at all but an editorial interjection of a 1953 legislative "fix" into the published text of the amended charter. See Facts ¶ 19, fn. 66 above. I need not make a final determination of that issue because there is no ambiguity in the critical deletions.

127. It is not clear whether the Receiver attaches significance to the fact that, at § 3–608 of the charter, where three deleted school committee provisions previously resided, the charter now says "reserved." The word reserved in that place merely reserves the section number for possible future use. It does not in any sense reserve the deleted provisions that had previously been codified at that section number. In any event, the word reserved appears only in § 3–608 and not also in § 3–100, the place of the deletion of real consequence.

to City authorities. Rather, they are appointed by the board of regents for elementary and secondary education from nominations made by the commissioner of elementary and secondary education.[128] Four of its seven members "shall be residents of the city and parents of current or former Central Falls public school students."[129] But, as they do not hold their positions by virtue of the charter and do not answer to City electors or a City appointing officer, their City residency does not make them City officials and does not make the Board the *City's* school committee. The political and constitutional separation of the School District from the City is complete.[130]

I do not suggest that this state of affairs is not temporary or provisional. Still, the court cannot know the future and, in any event, must judge this controversy according to present circumstances, not circumstances as they may yet develop.

### f. Facts Deemed Irrelevant

In making this determination, the court has deemed certain facts to be of little or no relevance, and these should be dealt with expressly. First is the fact that the City has been wholly dependent on outside sources, mostly the State, for the funding of its operating budget for over twenty years. This fact is irrelevant because there is no state law that makes it a factor of significance to the continued relation of

this school district to this city. Municipalities routinely receive state funding, some more than others. The Unions have cited to me no feature of state law that might alter the relation of a municipality to its school district on the basis of the extent or duration of its state funding. Much less have they specified a legal tipping point.

Second is the duration of the period in which the City has not had control of its schools. Again, nothing in the governing law states that after a certain number of years in the care of a state administrator or board of trustees, a city's school district ceases to be *its* school district. It is possible for the state to have stepped in as caretaker for the City, even on an extended basis.

Third is the fact that state law may require the City to contribute to the funding of its schools. Again, the court is aware of no provision in the City's charter or in any state law that makes the School District's status—as part of the City or not—dependent on the presence or absence of an obligation to fund.

Fourth, the Receiver has emphasized that the School District lacks many of the attributes of municipal sovereignty, such as powers of taxation and eminent domain, and therefore should not be deemed a separate entity from the City. Under this theory, the School District must be a dependency of some sort. Again, nothing in the City's charter or in any other state law

---

128. R.I. Gen. Laws § 16–2–34(b).

129. *Id.*

130. This appears to be confirmed in the recent amendment of R.I. Gen. Laws § 16–2–9(a)(18) by 2011 R.I. Pub. Laws ch. 11–265, § 1. Prior to the amendment, § 16–2–9(a)(18) had simply indicated that "School committees shall have ... the following powers and duties: ... (18) To enter into contracts." The amendment added a proviso and an exception to the proviso. The proviso is "that the pow-

er and duty to enter into collective bargaining agreements shall be vested in the chief executive officer of the municipality and not in the school committee." The exception expressly excludes "the Central Falls school district board of trustees established by § 16–2–34" from the application of the proviso, thus negating any implied power or duty of the "chief executive officer" of Central Falls to enter into collective bargaining agreements on behalf of the Central Falls School District.

of which I am aware prohibits a city from severing its relationship to its school district, however dependent, by a properly approved and ratified amendment of its charter that disestablishes its school committee, especially where the State has already provided other governance and support for the school district. States have conjured all manner of entities and arrangements through which to fulfill their objectives.

Fifth, the Receiver emphasizes that the 1991 Act, which replaced the City's school committee with a state administrator, nonetheless expressly reserved for the City the status of "fiscal agent." It said: "The city of Central Falls shall continue to be the fiscal agent for the Central Falls school district, except that a separate interest-bearing checking account shall be established for the school district."[131] I have attached little significance to this fact for the following reasons. First, nowhere in the record has the Receiver supplied evidence of what it means to be the fiscal agent. At least for lack of evidence establishing its import, the title "fiscal agent" is wholly undefined and without significance. Second, the title does not appear in the City's charter and therefore cannot constitute the basis for a continuing charter-based relationship between the City and the School District. Third, the court is by no means confident that the City's status as fiscal agent has survived the significant changes to the relationship of the City to the School District that occurred after the 1991 Act, especially the 2002 Act and the amendment to the City's charter.

Sixth, the labels and classifications in the City's and School District's financial statements to the effect that the School District is not a component unit of the City and is a component unit of the State[132] are essentially offered as opinions of law and are therefore irrelevant. To the extent that they are simply offered as accountants' opinions, it suffices to note that accounting standards do not necessarily coincide with the law to be applied in this proceeding and have no relevance.

Seventh, the evidence of the operational independence of the School District from the City—that it maintains separate bank accounts and financial records, pays its own payroll, purchases its own insurance, enters into contracts, makes its own personnel policies and decisions, all independent of the City—is of little significance for two reasons. First, it has no significance under Rhode Island law for the charter-based relationship of the City to the School District. Second, the Unions have adduced no evidence that this practice differs from the practices of school districts that are parts of their respective municipalities.

### g. Conclusion as to Motion for Summary Judgment

The material facts are not in controversy, but on the factual record established by this motion, the Receiver is not entitled to judgment as a matter of law. Rather, on the governing law, it appears that judgment should enter against the Receiver with a declaration that the School District is not part of the City. Rule 56(f)(1) now expressly permits a court to grant summary judgment for a nonmovant, but only "after giving notice and a reasonable time to respond."[133] The Court will hold a status conference to determine whether judgment should enter against the Receiver or, in the alternative, whether this adversary proceeding should proceed to trial,

---

131. 1991 R.I. Pub. Laws ch. 312, § 4(e).

132. See Facts ¶¶ 51–52.

133. Fed.R.Civ.P. 56(f)(1).

as provisionally scheduled. The Receiver's second count is dependent on the outcome of the first. Upon a final determination that the School District is not part of the City, the second would be moot. Entry of this decision should not be delayed for a merely academic consideration of that issue. Therefore, as to Count Two, the court will hold the Motion for Summary Judgment in abeyance pending a determination as to whether summary judgment will enter against the Receiver on Count One. If that event, the court would enter an order deeming Count Two moot.

## ORDER

For the reasons set forth above, the court hereby ORDERS as follows:

1. The Cross–Motion of the Teachers' Union to Dismiss or Abstain is DENIED.

2. The two counts in this proceeding are non-core matters that are otherwise related to the City's bankruptcy case. Under 28 U.S.C. § 157(c)(1), this court will hear the adversary proceeding and, at the conclusion, enter proposed findings of fact and conclusions of law, subject to review and entry of final judgment by the district court as specified in § 157(c)(1) and related rules.

3. As to Count One, the Receiver's Motion for Summary Judgment is DENIED, and the court will schedule a hearing to determine whether, under Fed.R.Civ.P. 56(f)(1), the court should grant summary judgment for the Unions.

4. As to Count Two, decision on the Motion for Summary Judgment is deferred.

5. Pursuant to Fed. R. Civ. P. 56(h), the court hereby determines that the facts in the Facts section of this memorandum, except those enumerated below, are not genuinely in dispute and are established in this adversary proceeding. (This is not a conclusion that every fact so established is material.) The exceptions are the facts appearing in (i) the footnote to ¶ 15, (ii) ¶ 15.3, (iii) ¶ 15.5, (iv) the second and third sentences of ¶ 17, (v) the last sentence of ¶ 22, (vi) the last sentence of ¶ 26, (vii) the last sentence of ¶ 28, (viii) the last sentence of ¶ 30, and (ix) the footnote to ¶ 57.